UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       *Plaintiff,*

    *v.*                                   Case No. 18–CR-62 (PP-DEJ)

BRIAN L. GANOS, SONAG COMPANY, INC.,
MARK F. SPINDLER, AND NUVO CONSTRUCTION CO., INC.

       *Defendants.*

## DEFENDANT SONAG'S RESPONSE TO OBJECTIONS TO ENFORCEMENT OF RULE 17(c) SUBPOENAS

## I.

## INTRODUCTION

The magistrate judge enforced two subpoenas that Sonag Co., Inc. issued to the State of Wisconsin for information in its possession, not in the federal government's possession. That information bears directly and essentially on the pretrial question of compliance with constitutional and statutory requirements to assemble jury pools that fairly represent the community.

The state now has gathered the information. Sonag and the state have agreed on a protective order that covers the limited portion of the data that is

confidential under state—not federal—law. The confidential information is limited to birthdates for a small fraction, probably 8%, of voters in the Milwaukee Division of this district. Only the government's objections to these third-party subpoenas, and more recently the state's objections, have frozen disclosure of the state's information and the further progress of this case.

This Court should endorse the magistrate judge's order. That order clearly is right. At a minimum, it is not clearly erroneous or contrary to law, which is the standard of review on this non-dispositive motion. 28 U.S.C. § 636(b)(1)(A).

## II.

## FACTS

About five weeks before the pretrial motions deadline in this case, Sonag filed an eleven-plus page motion for a preliminary order approving and enforcing subpoenas *duces tecum* to the Election Commission and the Wisconsin Department of Transportation. That motion relied "principally on the due process clause of the Fifth Amendment to the United States Constitution, [Sonag's] jury trial rights under the Sixth Amendment, and on the provisions of the Jury Selection and Service Act of 1968." ECF No. 32, at 3.

The motion explained relevant provisions of the Eastern District of Wisconsin jury plan, which by statute governs jury selection. 28 U.S.C. § 1863(a), (b). It explained why the jury plan's use of actual voters and its apportionment

of prospective jurors not by county population, but by county voter turnout, over-represents comparatively affluent white citizens. It also addressed the probable cumulative over-representation of white citizens to which other features of the jury plan contribute.

The motion then made use of information publicly available to Sonag, and others, to offer a rough factual assessment of recent Milwaukee Division jury pools. That public information, which consists of annual reports that the federal Clerk of Court must file, United States Census data, and American Community Survey data, conservatively and preliminarily suggested under-representation of racial and ethnic minorities of about 7% in absolute terms. ECF No. 32, at ¶¶ 2-7.

Sonag's July 20 motion went on to offer a "preliminary opinion" from a political science professor who has relevant expertise in analyzing racial and ethnic disparities in voting patterns. He opined that the jury plan produces Milwaukee Division jury pools that are "not representative of the voting-age, citizen population of that division." ECF No. 32, ¶ 8.

To push the analysis further, Sonag explained what additional data its expert needs. In sum, Sonag and its expert need racial and ethnic identities of voters in the twelve counties of the Milwaukee Division. ECF No. 32, ¶ 9. The rest of the motion then explained how Sonag might obtain that demographic data not from the federal government, but from information that the State of Wisconsin must keep to comply with the Help America Vote Act. Some of the

necessary information is itself confidential under state law, so Sonag proposed the least intrusive way to obtain public but confidential fields necessary to pursue a possible challenge to the jury selection system in this district. In a suggested order submitted with its motion, Sonag proposed explicitly that the federal government receive whatever state information Sonag receives. Docket No. 32-1, at 1-2. That suggested order also included protective terms to accommodate legitimate privacy concerns under state law. ECF 32-1.

If able to obtain the information it sought from the State of Wisconsin by subpoena, Sonag predicted that it could meet the deadline for filing a "substantive motion challenging the district's Jury Plan." ECF No. 32, at 11.

On July 24, the magistrate judge conducted a hearing on the Sonag motion. At that hearing, four days after Sonag filed its motion for a preliminary order, the court itself suggested that Rule 17(c) subpoenas might be the best way to obtain the information Sonag sought. Sonag accepted that suggestion and the issue has proceeded on those terms through subsequent status conferences.

In the end, after discussions with state officials, Sonag and the state reached an agreement on how the state will comply with the subpoenas and on the terms of a protective order. The federal government will get all information disclosed to the defense under that agreement, and will be bound by the terms of the same protective order. The state has completed its work and is prepared to meet the subpoenas' obligations when this Court rules. The magistrate judge has

ordered the state to produce the data only after any order from this Court affirming enforcement of the subpoenas.  ECF No. 72, at 10.

## III.

## ARGUMENT

If the state's information confirms a factual basis for a pretrial challenge, Sonag will file a timely motion to strike the present jury wheels in the Eastern District of Wisconsin.  That motion, if ethically warranted, will rest on the Fifth and Sixth Amendment guarantees of a fair cross-section of the community in jury venires, and probably on the Jury Selection and Service Act of 1968.  Again, the government will have access to everything that Sonag obtains by subpoena, and the limited portion of that data that is confidential under state law will be secured by an agreed protective order.  This Court now must decide whether the magistrate judge permissibly enforced the two Rule 17(c) pretrial subpoenas.

**A.** *Standing*.

Before the magistrate judge, the state moved to quash the subpoenas on August 31, more than a month after Sonag served them.  That motion was short, not two pages in total.  One week later, the federal government filed a more expansive, and explanatory, motion to quash the same subpoenas.

The federal government's motion potentially presented the question, Can Party A seek to quash a subpoena directed only to Non-Party B?  The

5

information that the subpoenas seek is not federal information and the agencies that received the subpoenas are not federal agencies.

To Sonag's eye, the magistrate judge did not have to resolve that question. Albeit summarily, the state had moved to quash. And the federal government, as a party here, certainly had a right to weigh in on a disputed issue once a non-party with clear standing had raised it. *See* ECF No. 56, at 7 (Sonag's Response to Motions to Quash, September 6, 2018).

The situation is different now. Only the federal government initially objected to the magistrate judge's order enforcing those subpoenas, not the state agencies that must comply with the subpoenas. The federal government objected 14 days after the magistrate judge's oral ruling. ECF No. 69 (Government Objections, October 1, 2018). On October 9, the state joined those objections. ECF No. 73, at 2. The state added only one argument of its own: undue burden. ECF No. 73, at 2-3 (calling the order "unduly oppressive"). Because the federal government's objections are more first and extensive, the standing issue now matters.

The magistrate judge is correct. The cases he cites and his reasoning lead to the conclusion that the federal government has no standing to seek an order quashing subpoenas that are not directed to it, do not seek information in its possession, and otherwise implicate no federal interest other than the general interest in speedy trials. ECF No. 72, at 8-9.

While it is true that, "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests," *United States v. Raineri*, 670 F.2d 705, 712 (7th Cir. 1982), that rule gives the government little help here. The federal government has not asserted, and cannot credibly claim, any interest other than a general policy interest in a prompt trial. The specific Sixth Amendment right to a speedy trial is the accused's to assert, not the government's, for the Constitution gives no rights to the sovereign against the citizen there; it only gives the citizen claims or rights against the sovereign. Here, the citizens who seek information by subpoena have weighed their interests and claim no conflict with a speedy trial.

Moreover, the government is in a poor position to complain here or to assert the less tangible public policy interest. The government had this case under investigation for years before pursuing an indictment. Indeed, the alleged schemes date back to June 2004, and the superseding indictment sets August 2016 as the very end of the supposed conspiracies. ECF No. 25, at 1. The last substantive act that the superseding indictment alleges was on May 24, 2016, ECF No. 25, at 22, and the vast majority of specific acts date to 2013-2015. Yet the original indictment did not arrive until April 3, 2018. ECF No. 1.

Then the government immediately sought a complex case designation under this district's local rules, exempting the case from the normal speedy trial timeline. The government took weeks to produce all of the

discovery materials it had already. Supplemental discovery items continue to come, with the most recent production of more than 2,500 pages arriving in counsel's office on October 9. The government agreed to the motions schedule. Other pretrial motions remain pending now before the magistrate judge.

And today, the state's compliance with the two subpoenas could proceed at any time: that compliance is stayed only for the objections that the federal government filed to enforcement of those subpoenas, and that the state later joined. The current briefing schedule is attributable to the government's choices. Incidentally, too, while the government claims without substantiation or citation that geocoding "will take several months to complete," ECF No. 69, at 11, Sonag never has suggested that the necessary geocoding and surname analysis will take nearly that long. It will not. Counsel for Sonag has noted only that the analytics companies that do this work tend to be busy with political campaigns near elections, and that the looming November election may affect the timetable.

It is true that a motion to strike the district's jury wheels may imperil a tentative trial date in February 2019, which this Court has not yet confirmed in any event. But that possibility is not Sonag's fault, nor the fault of any defendant here. Rather, the state took more time to complete its compliance with the subpoenas than it expected. And the federal government now has slowed the process further with these objections.

The speedy trial clock remains tolled. No defendant has raised any speedy trial objection. The government's own actions here are not consistent with an assertion of a general interest in the prompt administration of justice. It really has, then, no good claim of standing to ask the Court to quash subpoenas to third parties. The state is ready to comply with those subpoenas when this Court ratifies the magistrate judge's order enforcing them.

Now that the issue is unavoidable, the federal government does not have standing to challenge these pretrial subpoenas. This Court can overrule its objections on that basis alone. Sonag addresses the one separate argument that the state makes in part III.D below.

**B.** *Merits.*

Before the magistrate judge, both the state and the federal government relied heavily on *United States v. Nixon*, 418 U.S. 683 (1974), in challenging Sonag's effort to obtain the public information that would reveal how well or poorly the district is doing in drawing jury pools from a representative cross-section of the community. Although *Nixon* is one of only two meaningful statements that the Supreme Court has made on Rule 17 subpoenas (the other is *Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951)), it is an unusual case for other reasons, too.

As the cover-up after the 1972 Watergate burglary wore thin, Special Prosecutor Leon Jaworski secured an indictment against seven White House

aides.  He then sought to obtain Oval Office audio tapes that he expected would include conversations involving the defendants that would be admissible at trial. President Nixon asserted executive privilege on general confidentiality grounds and moved to quash the pretrial subpoena.  The district court denied the motion to quash and ordered *in camera* review of the tapes to decide which ones, if any, the Special Prosecutor would get.  Given its national importance, the case went straight to the Supreme Court on opposing requests for certiorari.

Like the district court, the Supreme Court upheld the Rule 17(c) subpoena.  Specifically, it found no error in the district court's conclusion that the Special Prosecutor met his burden of establishing relevancy, admissibility, and specificity.  *Nixon*, 418 U.S. at 700.  True, the Special Prosecutor only could guess at the exact content of tapes he had not heard.  But he had offered sworn statements by some of the participants in certain conversations to their content. As to other tapes, the identities of the participants and the time and place of the conversations supported a "rational inference" that at least parts of the conversations would be relevant.  *Id.*

For two basic reasons, the Supreme Court approved the district court's rulings on relevancy, admissibility, and specificity.  First, Rule 17 itself provided that, "A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise."  *Nixon*, 418 U.S. at 698.  Second, "Enforcement of a pretrial subpoena *duces tecum* must necessarily

be committed to the sound discretion of the trial court." *Id*. at 702. *Nixon* finally rejected the blanket claim of executive privilege there that might have blocked even relevant information, and the subpoena stood. *Nixon*, 418 U.S. 703-13.

The limitation that a motion to quash a Rule 17(c) subpoena will lie only "if compliance would be unreasonable or oppressive" remains in the current version of the rule. FED. R. CRIM. P. 17(c)(2). The *Nixon* Court did not formally adopt the four-part test that the government relies upon, although the Supreme Court certainly quoted favorably that test from a 1952 district court opinion and named its influential author, Judge Edward Weinfeld (1901-1988). *Nixon*, 418 U.S. at 699-700. Still, the actual holding rested on the three elements that Sonag cites above: relevancy, admissibility, and specificity. Further, as to the first part of Judge Weinfeld's four-part formulation, whether the documents sought are "evidentiary," the *Nixon* Court saw no need to decide whether a less exacting standard would apply when a Rule 17(c) subpoena goes to a third party, like here. *See Nixon*, 418 U.S. at 699 & n. 12.

As in *Nixon* itself, this Court should enforce these subpoenas *duces tecum* even if the four-part test governs in full. *Nixon* expressed that formula this way: the party seeking to use a Rule 17(c) subpoena for documents must show "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and

inspection in advance of trial, and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Nixon*, 418 U.S. at 699-700. The magistrate judge correctly cited this test and faithfully applied it. Sonag relies on his application of *Nixon*.

Additionally, Sonag considers succinctly each of the four parts.

1. The government does not contend that the WisVote database, correlated to race and ethnicity with the DOT database, is not evidentiary or not relevant to the jury selection issue. Neither could the government contend that. The WisVote database is the very same source from which the Clerk of Court draws names of actual voters for purposes of assembling a master jury wheel. And the race, ethnicity, and sex data are the precise information necessary to assess a fair cross-section claim.

The fact that the documents sought are not relevant to a later trial on the general issues of guilt or innocence is beside the point. Sonag seeks the documents for a pretrial issue—and indeed, for an issue that must be raised before trial, if it can be. The United States would rely on the same documents or data in responding to a fair cross-section challenge, and does not identify any other documents or data that would be more relevant or have greater evidentiary value. Sonag meets the first criterion, as the magistrate judge held.

2. No amount of diligence on Sonag's part reasonably could procure elsewhere the data that the subpoenas seek. Sonag has exhausted public sources that require no subpoena. The state now is the only repository of the necessary information, in other words. Part of that information is confidential under state law. The state also has agreed to match one database that the Elections Commission maintains, WisVote, against another that the DOT maintains. Sonag could not possibly compel that other than by use of a subpoena or court order. And, because of a state administrative rule, even the non-confidential information here would be prohibitively expensive without a subpoena or court order (which is another issue altogether, but one that this Court need not reach because of the agreement that the state agencies have struck with defense counsel).

3. Again, while this information does not go to the issues at trial in a narrow sense, it is essential to an important pretrial evidentiary issue—for both parties. Because of the geocoding and surname analysis that will be required on the WisVote names for which there is no DOT "hit," and because of the demographic analysis required as a whole for both parties here, neither the government nor the defense could prepare for a pretrial hearing on this district's jury selection procedures and a fair cross-section challenge without seeing the data that the subpoenas seek well before an evidentiary hearing. Producing the WisVote database, cross-checked with the DOT database, only at a hearing on a

13

fair cross-section challenge would delay unreasonably the completion of that evidentiary hearing for days or weeks.

4. Defense counsel's request for a court order (or, after the Court reshaped the request, for Rule 17(c) subpoenas) was in good faith and not a "fishing expedition." Here, the government faults defense counsel for conceding that he will not file a substantive motion to strike the jury wheels in this district unless convinced that he has a factual and legal basis to do so. ECF No. 69, at 7. True; counsel will not. But in more than 11 pages in his initial motion on July 20, counsel laid out the preliminary reasons for obtaining further data to prove, or disprove, what already appears to be significant under-representation of minority groups on Eastern District of Wisconsin jury panels. Counsel took the initial steps of obtaining the public data he could from the Clerk of Court, in the form of recent JS-12 reports. He gathered initial demographic information from census and American Community Survey data, also publicly available. He hired an expert to give him a preliminary opinion, and to explain what further data will be necessary to test that preliminary opinion. Finally, he filed a motion seeking the court's aid in obtaining that information—for all parties here, not just for the defense, and with appropriate protective measures in a court order.

Beyond that, counsel is not trying to circumvent Rule 16 discovery or to rummage through government work product in the hope of discovering some defense on the merits. No federal government information or work

product is even the subject of these subpoenas; no federal officer is under subpoena. The magistrate judge was exactly right: Rule 16 regulates only discovery of "evidence in possession of the prosecution" or the defense. ECF No. 72, at 5. These subpoenas concern neither. So, this case is unlike *United States v. Tokash*, 282 F.3d 962 (7th Cir. 2002), and similar cases, whatever one makes of the concerns the *Tokash* court aired. *See* ECF No. 69, at 5-6. There is no effort "'to blindly comb through government records in a futile effort to find a defense to a criminal charge'" here. ECF No. 69, at 6. These are not government records at all—in the sense that *Tokash* used the term to refer to federal prosecution files— and this legitimate pretrial issue is not about a defense.

These subpoenas instead seek information from the state. That information goes to a systemic issue that is at the heart of the legitimacy of federal courts: whether citizens have a fair and generally equal opportunity to participate in the work of the third branch of government in the only way they can, through service as a grand or petit juror. No citizen can vote in judicial elections in federal court, as a means of democratic participation, for the judiciary is appointed. Serving as a juror is all there is, as a chance to participate in the third branch's work. If white citizens, relatively affluent ones at that, have a materially disproportionate advantage in gaining that chance, as compared to other citizens, that is a structural, systemic issue second in importance to none. It is an issue that far exceeds the importance of this, or any other, single case.

Sonag has made an initial showing that there is reason to be concerned about exactly this disparity of opportunity. Its showing is akin to the Special Prosecutor's showing in *Nixon*. No, he had not heard the tapes. But he had participants who said what some of those tapes probably recorded, and he had places, times, and participants for other tapes. He offered the groundwork he reasonably could. That warranted enforcing his subpoena, so that he could get the actual tapes. Sonag has offered preliminarily what it reasonably can, too.

At a minimum, the fair cross-section issue bears further factual exploration. The two subpoenas seek what both parties and the Court itself need for that factual exploration. Public data, including demographics, is all Sonag asks from the State of Wisconsin. Most of it is non-confidential under state law; the limited information that is confidential, some voters' birthdates, will be safe under the protective order that defense counsel concedes is appropriate, and the terms of which the State of Wisconsin helped draft and concedes are acceptable. The subpoenas are narrowly drawn to obtain only what the parties and the Court need. The agreed protective order then will guard the limited information that is confidential under state law.

The government argues at last that compliance with the subpoenas would be unreasonable or oppressive. ECF No. 69, at 8. Not to the federal government, though: this is an argument that the state alone was in a position to make, and only recently has. In part, perhaps that is because the state and Sonag

collaboratively have reached an agreement that reduced dramatically the confidential data that the state will have to disclose. So, if any unreasonable or oppressive extra work remains here for the parties and the state, it is only the briefing that the federal government's resistance has caused.

### C. *Interplay of Statute and Constitution.*

1. Citing 28 U.S.C. §§ 1863(d), 1867(f), the government argues that the Jury Selection and Service Act cabins the information that the defense can obtain, and that these subpoenas are beyond those limits. Indeed, the government even suggests that the Act gives it access to voter information that the defense cannot have, under § 1863(d). ECF No. 69, at 8-10.

In sum, the government's view is that the last civil rights legislation of the 1960's (for this is what the Jury Selection and Service Act was), and specifically the federal statute that was intended to extend and ensure a fair opportunity for jury service to all citizens regardless of race or sex, today should be interpreted to defeat its very purposes. The Act that Congress meant to eliminate the vestiges of "key man" jury selection systems, or jury-commissioner or bystander jury selection systems, that long excluded non-white and female citizens from juries now should be used to hide and nurture the modern forms of that same discrimination, in the government's view.

That proposition would bear lengthy consideration by both Court and counsel, if enforcing these subpoenas required it. The magistrate judge

correctly recognized that the subpoena enforcement issue does not require that consideration, though. ECF No. 72, at 5. Yes, this Court could decide whether a statutory sword against race and sex discrimination in composition of jury pools should be converted to a shield for that same discrimination. The Court could decide whether due process ever would allow the government alone to have access to factual information that might prove unlawful discrimination or disparities in jury pool composition. But it need not.

There is a shorter, proper route. Sonag contemplates not just a challenge under the Act. It contemplates also a Fifth and Sixth Amendment challenge, and has said so since July 20. The Supreme Court understands the Sixth Amendment to include a fair cross-section requirement. *See, e.g., Taylor v. Louisiana*, 419 U.S. 522 (1975); *Duren v. Missouri*, 439 U.S. 357 (1979) (fair cross-section requirement of Sixth and Fourteenth Amendments bar practical exclusion of women from jury eligibility, or severe under-inclusion); *see also Smith v. Texas*, 311 U.S. 128 (1940); *Carter v. Jury Comm'n*, 396 U.S. 320 (1970).

The constitutional imperative of a fair cross-section of the community in jury pools also arises under the equal protection clause of the Fourteenth Amendment. Indeed, the Supreme Court came to that conclusion almost a century before *Taylor*. *Strauder v. West Virginia*, 100 U.S. 303 (1880); *see also Smith v. Texas*, 311 U.S. at 129-31. All the more, the equal protection component of the Fifth Amendment's due process clause requires the same. An

accused need not be a member of the under-included class to raise a claim, either. *Peters v. Kiff*, 407 U.S. 493 (1972); *Powers v. Ohio*, 499 U.S. 400 (1991).

Nothing in the Jury Selection and Service Act of 1968 does or could impair the factual inquiry into possible Fifth and Sixth Amendment violations that Sonag, the Court, and the government should undertake here. It is not purely a statutory claim that Sonag pursues, or a statutory remedy that it will seek. Whatever the possible statutory constraints on asserting a claim under that same statute, then, they could not shackle a constitutional claim. The government cannot point to any case holding that they do. And the Supreme Court never has limited the sources of information by which a party may support a constitutional fair cross-section claim; to the contrary. *See, e.g., Glasser v. United States*, 315 U.S. 60, 87 (1942); *Carter v. Texas*, 177 U.S. 442, 444-49 (1900).

2. Finally, the government's assertion that "this single criminal case is not the proper venue for revising the Jury Plan for the entire district" misses the point. ECF No. 69, at 10. Sonag addresses jury composition, not the jury plan for its own sake. And single cases are exactly how jury selection procedures—if not jury plans specifically—are challenged. The reported cases, starting with *Strauder* nearly 140 years ago, did not arise from Court Administration Committees sitting with coffee cups around conference room tables. They arose in single cases, in courtrooms. The Act itself not just invites challenges in the context of a single case, it requires them. 28 U.S.C. § 1867(a).

Surely, it is well and good for the government to stand "ready to work with the Court when it revisits the district's Jury Plan." ECF No. 69, at 10. But meanwhile, the constitutional and statutory rights of two men and one corporation are at stake. So is the equal opportunity for participation in jury service that the Fifth Amendment guarantees all citizens—today, not just on some later day when a committee ponders improving the district's jury plan.

### D. State's Objection.

1. Sonag turns now to the only separate objection that the state lodges: undue burden. It is an odd objection at the outset, for two reasons. One, the state concedes that it already has completed all of the work necessary for compliance. There is no further burden now, and this Court could not restore to the state the expenditure of time and resources it has made. Moreover, the agreement with defense counsel on the scope of compliance and a protective order eased substantially the potential burden to state interests of disclosing public but confidential information.

Two, the state complains that a disclosure of the very limited confidential information that the subpoenas seek—and again, that is only dates of birth for about 8% of the voters at issue in the twelve counties—would violate state and federal law "without judicial authorization." ECF No. 73, at 2. But judicial authorization is exactly what the magistrate judge's order provided. The state already has what it says it wants, in other words.

2.     The only unanswered concern about undue burden the state cites is the possibility that digital data in possession of defense counsel, the federal government, or their respective experts will be hacked and stolen. "Obviously, a data breach of these private networks would be a disaster," the state writes ominously. ECF No. 73, at 3. It then adds, without explanation, that a transfer of the digital data only to the Court "would be more secure."

First, both federal and state governments are subject to many more cyberattacks than are the network systems of a small law firm or a professor. Federal agencies have had notorious breaches of data security. So, there is no clear reason to suppose that the Court's network is more secure than the private networks here.

But more broadly, while Sonag certainly concedes that no data breach is good and that computer hacking and cybercrimes are a constant modern threat, the Court also should bear in mind the actual data at issue here that are confidential under state law: dates of birth of about 8% of the voters in the Milwaukee Division's twelve counties. While birthdate in fact is a confidential field under Wisconsin law, our birthdays also are something that we often disclose publicly. Driver's licenses and state identification cards carry them. We disclose that birthdate, either verbally or by displaying our identification, in a variety of mundane contexts: buying beer, checking into a hotel room, and so on. Many people celebrate their birthdays publicly, for that

Case 2:18-cr-00062-PP-DEJ   Filed 10/15/18   Page 21 of 23   Document 74

matter, in restaurants and banquet halls. Yard signs proclaiming, say, how nifty it is that someone is fifty are common. And not a major league baseball game occurs in this country without a huge scoreboard display of birthday greetings by name for several fans.

Again, no data breach is good. But birthdates are not the most sensitive information. And here, only about 8% of voters (those without a driver's license or a state identification card) will have their birthdates disclosed to the parties.

Because the state and Sonag reached an agreement on how the state will comply, more sensitive confidential fields—for example, Social Security numbers—will not be disclosed when the state provides information under the two subpoenas. Neither will political party affiliation, past criminal records, or any other confidential field that may raise greater privacy concerns. For about 92% of voters, not even the limited confidential information of their birthdates will be disclosed. There is no undue burden.

## IV.

## CONCLUSION

Sonag Co., Inc. more than satisfied the standards for Rule 17(c) subpoenas. The Court should enforce these subpoenas now.

Dated at Madison, Wisconsin, October 15, 2018.

Respectfully submitted,

SONAG CO., INC., *Defendant*

*/s/ Dean A. Strang*

Dean A. Strang
  Wisconsin Bar No. 1009868
John H. Bradley
  Wisconsin Bar No. 1053124

STRANGBRADLEY, LLC
33 East Main Street, Suite 400
Madison, Wisconsin 53703
[608] 535-1550
dean@strangbradley.com