UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

                                     Case No. 18-cr-62-pp

   v.

BRIAN GANOS, MARK SPINDLER,
SONAG COMPANY, INC., and
NUVO CONSTRUCTION COMPANY INC.,

           Defendants.

## ORDER ADOPTING JUDGE JONES'S RECOMMENDATION (DKT. NO. 80), AND DENYING DEFENDANT BRIAN GANOS'S MOTION TO SUPPRESS EVIDENCE (DKT. NO. 39)

Defendant Brian Ganos filed a motion to suppress evidence obtained from the execution of two search warrants. Dkt. No. 39. The government filed identical affidavits in support of the two warrants; one warrant authorized the search of the home office of the accountant for the defendant's businesses and the other authorized the search of an office building owned by a holding company owned by the defendant (but used by other businesses). Dkt. Nos. 39-1 and 39-2. In his suppression motion, the defendant argued that the warrants lacked probable cause, and that the affidavits misrepresented the informant's opinions as facts and failed to disclose that the informant took some of the business records summarized in the affidavits without authorization, and possibly at the direction of investigators. Dkt. No. 39 at 1-2. At a hearing in September 2018, Magistrate Judge David Jones denied the defendant's request

1

for an evidentiary hearing, concluding that he had all the evidentiary material he needed to resolve the motion. Dkt. No. 68 at 2. He also concluded that there was no evidence of reckless disregard for the truth, and so found no need for a Franks hearing.[1] Id. at 2. In his November 2018 report and recommendation, Judge Jones concluded that the defendant lacked standing to object to the search of some of the areas the agents searched. Dkt. No. 80 at 8-9. To the extent that the defendant had standing to challenge the search of other areas, Judge Jones found that the affidavits provided probable cause for him to sign off on the warrants. Id. at 15. Finally, Judge Jones concluded that even if the affidavits had not established probable cause, the officers who executed the warrants relied on them in good faith. Id. The defendant timely objected to those conclusions. Dkt. No. 84. The court overrules the objection, adopts the recommendation and denies the motion to suppress.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The motion asks the court to exclude "all evidence obtained by the government from the execution of search warrants at 5500 W. Florist Avenue in Milwaukee and W147 N5146 Dolphin Drive in Menomonee Falls that were authorized on July 29, 2016." Dkt. No. 39 at 1.

### A.    Factual Background

The warrant applications sought authority to search the two locations for evidence relating to a conspiracy to defraud the United States; false

---

[1] Franks v. Delaware, 438 U.S. 154 (1978).

statements; major fraud against the United States; fraud by wire, radio or television; money laundering; and offenses against the Small Business Administration (referred to in the application by its acronym, SBA). Dkt. No. 39-1 at 1.[2]

In the extensive affidavits, the affiant attested that the defendant became the owner and president of Sonag Co., Inc., a general contractor located in Milwaukee, Wisconsin, in 1992. Id. at ¶25. As a Hispanic male, the defendant qualified as a disadvantaged individual for purposes of obtaining government set-aside contracts through the SBA's Section 8(a) Program. Id. at ¶¶12, 25. The affiant attested that when Sonag graduated from the program in May 2003, the defendant—with assistance from project manager James Hubbell—pursued a scheme to defraud the United States by obtaining 8(a) and Service Disabled Veteran Owned Small Businesses (SDVOSB) set-aside government contracts to which he was not entitled. Id. at ¶¶ 25–26. The defendant and Hubbell allegedly did this by recruiting individuals who qualified as disadvantaged individuals to serve as the purported owners of newly formed construction companies. Id. ¶26. The affiant asserted that the defendant and Hubbell controlled these newly-formed companies—Nuvo, Pagasa and C3T—which allowed them to financially benefit from contracts that Sonag Co. Inc. was not eligible to receive. Id. The affiant stated that the defendant, with assistance

---

[2] The affidavits at dkt. nos. 39-1 and 39-2 are identical, so the court will cite only to one of them.

from Hubbell, received 8(a) set-aside contracts valued at approximately $197 million. Id. at ¶29.

The affidavit states that the building on Florist Avenue housed three entities—Sonag, Nuvo and C3T. Id. at ¶28. At the time the affidavit was submitted, the defendant was president and minority shareholder of Sonag and vice-president and minority shareholder of Nuvo. Id. at ¶8A. The affidavit alleges that the building was owned by Sonag I, LLC, a property management company owned by the defendant. Id. at ¶39.

The affiant explained that CS-1 had approached law enforcement in 2014. Id. at ¶31. The affiant represented that CS-1 had worked for Sonag and Nuvo for fourteen years, and that this employment "gave him/her an intimate knowledge of specific contract details, office culture, and financial transactions." Id.

CS-1 reported that the defendant had approached Jorge Lopez, a Sonag project manager, when Sonag was graduating from the 8(a) program and asked Lopez to become president of Nuvo. Id. ¶32. At the time, Lopez was suffering personal financial hardship and "may have been on the verge of losing his residence" and agreed to become president. Id. According to the affiant, Wisconsin Department of Financial Institutions (DFI) records showed that in March 2001, Lopez changed the name of Insulation Masters, Inc.—a company he owned—to Nuvo, and the defendant had become a 15% minority owner. Id. at ¶33. When Lopez submitted Nuvo's initial SPA 8(a) program application, the

affiant attested Lopez said that he had an 85% ownership interest and that 100% of his hours were devoted to the firm. Id. at ¶34.

The SBA allowed Nuvo to bid on 8(a) projects based on a business plan listing Lopez as the 85% owner and full-time manager with an annual salary of $48,000, while reflecting that the defendant, as 15% owner, received no salary at all. Id. at ¶35. Although the program materials listed Lopez as Nuvo's president, majority owner and full-time manager, Hubbell managed the company's affairs. Id. at ¶¶ 34–65. CS-1 reported that shortly after Nuvo received its 8(a) status, Lopez moved to Worthington, Minnesota with his family. Id. at ¶40. The affiant reported that the government's investigation had corroborated that Lopez lived in Minnesota and worked for another company while he purported to the be the manager of Nuvo. Id. at ¶41. Lopez's tax returns confirmed that he moved to Minnesota in 2004; his 2007, 2009 and 2010 tax returns listed Worthington, Minnesota as his address. Id. at ¶42. His Minnesota license and renewal applications in 2006, 2010 and 2014 reported his home address as Worthington, Minnesota. Id. at ¶43. Employment and telephone records confirmed that he worked for another employer in Minnesota. Id. at ¶¶44-46.

The affiant explained in detail how financial records indicated that Lopez hid income from his Minnesota employer by transmitting it through Nuvo's business checking account. Id. at ¶47. From 2005 to 2012, as part of Nuvo's annual reports to the SBA, Lopez reported compensation from Nuvo but none from his other employer. Id. at ¶49. The affiant stated that CS-1 reported Lopez

exercised no control over Nuvo and rarely visited but kept personal effects and papers on his desk in Milwaukee so that it would look like he was controlling Nuvo. Id. at ¶52. CS-1 explained that Hubbell—not Lopez—managed Nuvo. Id. at ¶54. A second former Nuvo employee, who had worked at Nuvo from late summer 2013 to spring 2014, corroborated CS-1's statements. Id. at ¶53. Although SBA forms indicated that the defendant received no income from Nuvo and had no access to Nuvo's bank accounts, IRS and property records indicated that the defendant and his wife received a salary from Nuvo and that Nuvo paid for lakefront property and remodeling projects at their residence. Id. at ¶¶59-65.

According to the affiant, CS-1 reported that after establishing Nuvo, the defendant and Hubbell wanted to create a SDVOSB to benefit from the government set-aside contract program through the V.A. Id. at ¶71. They placed Telemachos Agoudemos, a service-disabled veteran, to serve as president and majority owner of C3T, Inc. Id. at ¶71. The DFI reported that the defendant owned C3T until April 3, 3006, when he transferred—for free—51% of the company's stock to Agoudemos and 49% to Hubbell as vice president. Id. at ¶74. In April 2006, Hubbell registered C3T as a self-certified SDVOSB, which allowed the company to bid on set-aside government contracts. Id. at ¶75. Although Agoudemos was listed as the owner of C3T, the affiant stated that the company was controlled by the defendant and Hubbell. Id. at ¶¶ 71–98. Like Sonag and Nuvo, C3T was located in the Florist Avenue office building. Id. at ¶ 72. From 2006 through 2016, C3T received about $197 million in SDVOSB set-

aside contracts. Id. at ¶99. As of July 2016, the company still was participating in the SDVOSBP and was being awarded government set-aside contracts. Id. at ¶102.

According to the affiant, the defendant, as a former participant in the 8(a) program, could not be a majority owner of a different 8(a) company. Id. at ¶105. The defendant chose Odessa Millan, an Asian-Pacific American woman who meets the social and economic requirements to be a Section 8(a) participant (and was a former project manager for C3T) to be president and purported owner of Pagasa Construction Company, Inc. Id. at ¶106. To establish the required work history to gain Section 8(a) status, Sonag, Nuvo and C3T listed and paid Pagasa for subcontractor work that the three companies performed themselves. Id. at ¶¶111–15. Pagasa obtained its Section 8(a) certification in September 2015; as of July 2016, it had not been awarded any Section 8(a) set-aside federal government contracts. Id. at ¶117. In the fall of 2015, Pagasa moved into the Florist Avenue building. Id. at ¶119.

CS-1 reported that an individual named Lori Michaud, an independent contractor, performed all accounting functions for Sonag, Nuvo and C3T and had work space in the Florist Avenue office building, although public records indicated that her accounting business operated out of her home on Dolphin Drive. Id. at ¶¶122, 129. The affiant attested that Michaud "ha[d] control over the entire general ledger function and the financial accounts for all of the referenced companies, which enable[d] her to transfer profits from job to job and company to company within the job-cost software." Id. at ¶127. Law

enforcement surveilled the Florist Avenue building and saw Michaud coming in around 8:00 a.m. every day and leaving daily around 4:30 p.m. Id. at ¶124. Agents interviewed Michaud in October 2012; she told them that she had helped Hubbell and Agoudemos set up C3T. Id. at ¶125.

On July 29, 2016, Judge Jones approved the warrants. Case Nos. 16-MJ-98 and 16-MJ-99, Dkt. No. 2. Law enforcement agents executed them on August 3, 2016. Id. They recovered items from the Florist Avenue office building but did not seize anything from Michaud's home office. Case No. 18-cr-62, Dkt. No. 80 at 6.

B.     The Defendant's Arguments

The motion asserted that the affidavits supporting the search warrants lacked probable cause because they did not provide the magistrate judge with enough information to assess the credibility of CS-1. Dkt. No. 39 at ¶¶7-9. A single paragraph in the affidavits identified CS-1 as someone who had been employed by Sonag and Nuvo for approximately fourteen years, "which gave him/her and [sic] intimate knowledge of specific contract details, office culture, and financial transactions." Id. at ¶4. The defendant argued that the affidavits did not identify CS-1's position in Sonag or Nuvo, which would have allowed the magistrate judge to decide whether CS-1 was in a position to know the things he/she told law enforcement. Id. at ¶7.

Next, the defendant argued that the affidavits represented as proven facts information that CS-1 had provided to the agents as "beliefs," or events that had "reportedly" occurred. Id. at ¶10. The defendant asserted that the way

the affiant worded the affidavit made it seem as though these "beliefs" or "reports" were established facts. Id. He also contended that while the affidavits stated that "CS-1 reported," or "CS-1 believed" certain information, the investigator's reports memorializing their interviews with the informant used a passive formulation such as "it is believed," implying that had Judge Jones known this, he might have questioned whether the information attributed to CS-1 actually came from CS-1, and whether it was based on CS-1's personal knowledge. Id. at ¶¶12-13.

The defendant also theorized that "[t]he affidavit's reliance on documents provided by [CS-1] suggests that the guiding hand of government agents [was] directing the informant to purloin specific internal, non-public company records for their use in establishing probable cause." Id. at ¶14. He pointed out that CS-1 provided investigators with emails, financial records and internal accounting records; because the defendant does not know who CS-1 is, however, or what position he/she holds with Sonag or Nuvo, the defendant argues that he "cannot know whether the confidential informa[nt] was an intended recipient of the emails or whether his access to the non-public company records was authorized." Id. The defendant asserts that the fact CS-1 was meeting with government investigators, coupled with the informant's production of increasingly specific information, "strongly suggests that investigators directed the confidential informant to obtain information and to report about the existence of records that substantiated the investigator's suspicions." Id. at ¶¶14-18. He asserts that knowing whether CS-1 was

gathering documents at the direction of investigators, and whether CS-1 was gathering documents that he/she would not have had access to in his/her position, would have mattered to the issuing magistrate judge's determination as to CS-1's credibility. Id. at ¶19.

Finally, the defendant argued that the good faith exception could not save the warrants, citing United States v. Harris, 464 F.3d 733, 740 (7th Cir. 2006) for the proposition that the good faith exception does not apply where "the officer seeking the warrant was dishonest or reckless in preparing the affidavit." Id. at ¶22.

C.    The Government's Response

The government first objected to the defendant's request for an evidentiary hearing on the motion, asserting that the defendant had not complied with Criminal Local Rule 12(c) because defense counsel never conferred with the government regarding any material disputed facts and had not provided a description of the material disputed facts. Dkt. No. 49 at 2. The government also argued that even if the defendant had complied with the local rule, the motion did not raise any disputed material facts that presentation of evidence would help resolve. Id. at 2-4. The government contended that the defendant's arguments amounted to speculation, and that the issue the defendant raised—whether the informant's information was reliable—was a decision Judge Jones could make from the face of the affidavit. Id. As the court has noted, Judge Jones agreed, and declined to hold an evidentiary hearing. Dkt. No. 68.

As to the merits of the motion, the government began by asserting that the defendant lacked standing to challenge the search of the Dolphin Drive residence, because that residence belonged to Lori Michaud—not the defendant. Dkt. No. 60 at 4. In a similar vein, the government argued that the defendant had failed to establish that he had any privacy interest in parts of the Florist Avenue building. Id. The government conceded that the defendant owned Sonag I, LLC, the property management company that owned the building, but contended that this did not give him a legitimate expectation of privacy in office spaced occupied by companies other than his own. Id. The government argued that while it believes it will prove that the defendant controls Nuvo, C3T and Pagasa, the defendant claimed only a minority stake in Nuvo and denied any ownership interest in C3T or Pagasa. Id. at 5-6. The government asserted that even as to Sonag Co. and Nuvo, the fact that the defendant was an officer of those corporations did not mean that he had an expectation of privacy in the records of those entities. Id. at 6.

The government also argued that the affidavits provided ample bases for the issuing magistrate to evaluate CS-1's credibility; the government pointed to the "extensive corroboration of CS-1's statement throughout the affidavit," and provided a table with examples. Id. at 8-11. The government dismissed the defendant's argument about the affiant representing "opinion" or "belief" as fact as the type of "hypertechnical nitpicking" that the Supreme Court has discouraged. Id. at 12 (citing Illinois v. Gates, 462 U.S. 213, 235 (1983).

Finally, the government argued that the defendant failed to demonstrate

that CS-1 was acting as a government instrument or agent. The government responds that CS-1 brought documents—unsolicited—to the first interview and was told to bring the documents back to the second interview, but brought no documents to the third interview. Id. at 14. The government also represents that it never directed CS-1 to collect documents and did not offer CS-1 a reward. Id. The government concluded by asserting that even without the documents obtained by CS-1, the affidavits still established probable cause. Id.

## II.    JUDGE JONES'S RECOMMENDATION (DKT. NO. 80)

In a sixteen-page report, Judge Jones recommended that the court dismiss the defendant's motion. Dkt. No. 80. Judge Jones agreed with the government that the defendant did not have a legitimate expectation of privacy in his accountant's accountan's home office or the entire Florist Avenue office building. Id. at 8. Judge Jones also noted that the challenge to the search of the Menomonee Falls home office appeared to be moot, because agents did not seize any evidence from it. Id. at 9. With respect to the Florist Avenue office building, Judge Jones concluded that the defendant had standing to challenge the search of the Sonag and Nuvo office spaces because of his interests in both companies. Id. Because the defendant had denied involvement with C3T or Pagasa, however, Judge Jones found that he did not have standing to challenge the searches of the office spaces of those entities. Id.

As to probable cause, Judge Jones found that the totality of the circumstances demonstrated that CS-1 was reliable. He recounted that the affidavits indicated that CS-1 had worked for Sonag and Nuvo for fourteen

years and had an extensive history with the defendant. Id. at 12. He pointed

out how the information CS-1 provided was highly detailed and suggested

personal involvement:

> describing that Mr. Ganos sought out Mr. Lopez to gain Section 8(a)
> status for Nuvo; that Mr. Hubbell and not Mr. Lopez actually
> managed Nuvo; that Mr. Ganos provided the financial backing for
> Nuvo; that Mr. Lopez moved to Minnesota and had limited
> involvement in Nuvo; that Mr. Ganos and Mr. Hubbell invoiced work
> Sonag, Nuvo, C3T, and others performed on their personal
> residences through government contracts; that Mr. Ganos and Mr.
> Hubbell sought out Mr. Agoudemos to gain service-disabled-veteran
> status for C3T; that Mr. Agoudemos did not actually run C3T's day-
> to-day affairs; that Mr. Hubbell was removed from C3T's payroll,
> business structure, and office space after its eligibility was
> suspended to create the impression that he had no involvement in
> the company; that Mr. Hubbell nevertheless continued to control
> C3T; that Mr. Ganos sought out Ms. Millan to gain Section 8(a)
> status for Pagasa; that Mr. Ganos and Mr. Hubbell were in fact in
> control of Pagasa; that Mr. Hubbell sought to establish a sufficient
> work history for Pagasa so it could acquire Section 8(a) status; that
> Pagasa never actually performed any of the work paid for by Ganos-
> affiliated companies; that Ms. Michaud provided accounting services
> for Sonag, Nuvo, and C3T; and that Ms. Michaud played accounting
> gymnastics with the companies' finances. *See id.* ¶¶ 32, 38, 40, 63,
> 71, 82, 92, 93, 105–06, 111, 116, 122, 127–28. Law enforcement
> independently corroborated most of this information. *See id.* ¶¶ 25,
> 33, 39, 41–48, 53, 59–62, 64–65, 72–73, 74, 77–79, 83–85, 92, 94;
> 107, 110, 112–14, 116, 123–26, 128, 129.

Id. at 13. Judge Jones opined that two factors weighed slightly against the

reliability of CS-1: the affidavits said that CS-1 approached law enforcement in

2014 but the government averred they met in December 2013, February 2014,

and March 2014; and CS-1 did not personally appear before Judge Jones (who

issued the warrants). Id. at 13. Judge Jones found that the strong showing in

the amount of detail provided and the level of police corroboration overcame

those concerns. Id.

Judge Jones found less significant the affiant's failure to disclose CS-1's role at Sonag and Nuvo, stating that that information was not critical to his probable cause determination. Id. at 13-14. He also concluded that probable cause would have existed even if the affiant had included qualifying language indicating that certain information in the affidavits was the opinion or belief of the informant or agents. Id. at 14. Finally, as to the defendant's theory that the government may have unlawfully directed CS-1 to collect confidential records, Judge Jones found that the defendant offered nothing more than speculation to support that allegation. Id.

Judge Jones concluded that even if the affidavits had failed to state probable cause, the executing officers relied on the warrants in good faith. Id. at 15. He found that the affiant "reasonably relied on information provided by CS-1, as well as several other sources, when seeking the warrant," and that she was not dishonest or reckless in preparing the affidavits. Id.

## III.   ANALYSIS

The defendant objects to Judge Jones's conclusions that he lacked standing, that the totality of the circumstances set out in the affidavits demonstrated probable cause and that the good faith exception applies. Dkt. No. 84.

### A.   Standard of Review

Under Federal Rule of Criminal Procedure 59(b)(3), the court considers *de novo* any portion of a magistrate judge's recommendation to which a party objects. If a party does not object, or objects to only a portion of the

recommendation, the court reviews for clear error any portions to which there is no objection. Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999). The district judge may accept the magistrate judge's recommendation, reject it or modify it. 28 U.S.C. § 636(b)(1).

    B.    <u>Standing</u>

        1.    *Legal Standard*

The Fourth Amendment guarantees "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONS. AMEND. IV (emphasis added). To bring a motion to suppress for a Fourth Amendment violation, a defendant must demonstrate that he "'has a legitimate expectation of privacy in the invaded place.'" Minnesota v. Olson, 495 U.S. 91, 95 (1990) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)) (citing Katz v. United States, 389 U.S. 347 (1967)). To have standing, the defendant must establish that he had both "a subjective and an objectively reasonable expectation of privacy." United States v. Walton, 763 F.3d 655, 658 (7th Cir. 2014). An objective expectation of privacy is one "that society is prepared to recognize as 'reasonable.'" Id. (quoting Katz, 389 U.S. at 361. The subjective prong of the expectations analysis presents a fact-specific inquiry that looks "to the individual['s] affirmative steps to conceal and keep private whatever item was the subject of the search." Id. (quoting United States v. Yang, 478 F.3d 832, 835 (7th Cir. 2007)).

2. *Discussion*

The court is stymied by the defendant's objection to Judge Jones's ruling on standing. The objection consists of two sentences and some case cites:

> [E]ither Ganos or Sonag, which he owns entirely (see ECF #36) have standing to challenge the search warrants. Broadly, under *United States v. Groce*, 255 F. Supp. 2d 936, 943 (E.D. Wis. 2003) (citing *Murray v. United States*, 487 U.S. 533, 542 (1988), *United States v. Markling,* 7 F.3d 1309, 1315 (7th Cir. 1993)), a defendant may challenge a search warrant obtained based on evidence recovered during a previous, unlawful search. *See United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) ("In assessing whether the results of the subsequent search must be suppressed, we ordinarily consider whether the illegally obtained evidence affected the magistrate's decision to issue the warrant and, secondly, whether the agent's decision to obtain a warrant was prompted by knowledge of the results of the earlier illegal search.")

Dkt. No. 84 at 1-2.

First, the court doesn't understand the practical basis for the defendant's assertion that *Sonag Co., Inc.* has standing to challenge the affidavits that supported the search warrants. The defendant's motion is titled, "*Brian Ganos'* Motion to Suppress Evidence," dkt. no. 39 at 1, and the last paragraph says that "*Brian Ganos* respectfully requests that this Court grant the relief requested . . . ." *Sonag* didn't challenge the search warrants. *Sonag* didn't file a motion to suppress, or join the defendant's motion. If counsel for Sonag had believed that Sonag had standing to challenge the search warrants, he could have filed a motion to suppress on Sonag's behalf, or joined this one. Why is the defendant objecting to Judge Jones's conclusion that *he* did not have standing to contest the searches of some locations by asserting that *Sonag* had standing to contest the searches?

Second, Judge Jones made two rulings regarding standing. He concluded

that the defendant did not have standing to challenge the searches of the

accountant's home office and the offices of C3T and Pagasa (as well as

concluding that the defendant's challenge to the affidavit supporting the

warrant to search the accountant's home office was moot, because agents

didn't seize any evidence from that office). He also concluded that the

defendant's "interests in Sonag and Nuvo are sufficient to establish standing."

Dkt. No. 80 at 9. The defendant's two-sentence objection does not identify

which of these rulings the defendant contests. The court is left to assume that

the defendant is not objecting to Judge Jones's conclusion that he has

standing to challenge the searches of the Sonag Co., Inc. and Nuvo offices,[3]

---

[3] The Supreme Court has held that "one has standing to object to a search of his office, as well as of his home." <u>Mancusi v. DeForte</u>, 392 U.S. 364, 369 (1968). It is not so clear whether an owner or officer of a corporation or business has standing to challenge the search of the entire business. The Ninth Circuit has held that "an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized." <u>United States v. SDI Future Health, Inc.</u>, 568 F.3d 684, 698 (9th Cir. 2009). The Second Circuit has held that "[t]he question whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched," which requires "a sufficient 'nexus between the area searched and [his own] work space'"—something that "necessarily must be determined on a case-by-case basis." <u>United States v. Chang</u>, 897 F.2d 646, 649-50 (2d Cir. 1990) (citations omitted). Judge Kennelly of the Northern District of Illinois provides a thorough and thoughtful analysis of this issue in <u>United States v. Novak</u>, Case No. 13 CR 312, 2015 WL 720970 (N.D. Ill. Jan. 6, 2015). Even if the defendant's ownership of Sonag Co., Inc. and his minority interest in Nuvo gave him standing to challenge the searches of the offices of those entities, the court finds that Judge Jones had a substantial basis for concluding that the affidavit supporting the warrants for those searches provided probable cause.

and that he is not persisting in challenging the affidavit supporting the application for the warrant to search the accountant's home office when there is no evidence from that search that the court may suppress.

Third, assuming the defendant is objecting to Judge Jones's conclusion that he did not have standing to challenge the search of the offices of C3T or Pagasa, the court finds it hard to see how the cases he cites are relevant to that objection. Judge Jones concluded that because the defendant had "denied having any involvement with C3T or Pagasa," the defendant did not have standing to challenge the searches of those offices. Dkt. No. 80 at 9. The cases the defendant cites in his objection—Groce, 255 F. Supp. 2d 936 and Gray, 410 F.3d 338—do not discuss whether an individual who owns a management company that owns a building has standing to challenge the search of offices within that building when he claims to have no involvement in the businesses occupying those offices. They do not discuss standing at all.

Groce involved a defendant charged with being a felon in possession of a firearm and possessing cocaine base with intent to distribute. Groce, 255 F. Supp. 2d at 937-38. Law enforcement officers investigating a drug conspiracy searched the defendant's home without a warrant—claiming that his father consented—and saw cocaine in the defendant's bedroom. Id. at 937. Based on this search, the officers got a search warrant for the home, conducted a more thorough search and found the gun and the drugs that formed the basis for the charges. Id. Judge Lynn Adelman held that the defendant's father had not consented to first search, the one that provided the basis for the issuance of

the search warrant. Id. at 939-940. He also found that the first search could not be justified under the "protective sweep" exception to the warrant requirement. Id. at 940-943. Because he found that the first, warrantless search was unlawful, and because "the information derived from that search was the basis for obtaining a warrant," Judge Adelman concluded that the evidence seized during the execution of the warrant "was the fruit of the poisonous tree," and granted the defendant's motion to suppress that evidence. Id. at 943-45.

In Gray, one of the defendants argued that the "district court should have granted his motion to suppress evidence obtained during a 2002 search of his home." Gray, 410 F.3d at 343. He argued that "the affidavit in support of the warrant [for the 2002 search] did not contain sufficient evidence—apart from evidence obtained during an invalid 2001 search—to support a finding of probable cause." Id. The Seventh Circuit disagreed, id., and pointed out that "[a] search warrant obtained, in part, with evidence which is tainted can still support a search if the 'untainted information, considered by itself, establishes probable cause for the warrant to issue.'" Id. at 344 (quoting United States v. Oakley, 944 F.2d 384, 386 (7th Cir. 1991)). Because the Seventh Circuit concluded that there was untainted information to support the magistrate judge's decision to issue the warrant, the court rejected the defendant's argument. Id.

The defendant did not explain why he believes that cases about whether evidence from a prior illegal search taints a warrant application support his

objection to Judge Jones's conclusion that he did not have standing to challenge the search of the offices of C3T or Pagasa, so the court has tried to connect the dots. In his motion to suppress, the defendant cited these same cases in support of an undeveloped argument relating to the defendant's theory about how CS-1 came to have some of the documents he or she provided to law enforcement agents. Citing to the investigative reports he received in discovery, the defendant posited a theory that the agents were using CS-1 "to purloin specific internal, non-public company records for their use in establishing probable cause." Dkt. No. 39 at ¶14. While the caption of that section of the motion said this theory related to CS-1's credibility, <u>id.</u> at p. 7, the defendant concluded by stating that "[w]hether the confidential informant provided investigators with non-public records of the company, and whether this occurred at the direction of government agents . . . may . . . evidence a violation of Fourth Amendment rights." <u>Id.</u> at ¶19. He then cited <u>Groce</u> and <u>Gray</u>.

Trying to connect this vague assertion to the defendant's statement that "either Ganos or Sonag . . . have standing to challenge the search warrants," the court hazards a guess at the defendant's rationale: CS-1 was working as an agent of the government. Long before the government submitted the search warrant applications to Judge Jones, CS-1—acting as an agent of the government—illegally seized documents that belonged to Sonag Co., Inc. (which is owned by the defendant). The agents referenced that illegally-obtained evidence in the affidavits they presented to Judge Jones, and Judge Jones relied on that information to issue the warrants. Because the warrants were

obtained by affidavits that contained allegedly tainted evidence, the warrants were invalid. Because the illegally-seized documents belonged to Sonag Co., Inc., which is owned by the defendant, the defendant and Sonag have standing to challenge evidence seized from all the areas the agents searched, including the accountant's home office and the offices of C3T and Pagasa.

If this is the defendant's argument, he did not articulate it sufficiently for Judge Jones to consider and rule on it. A single sentence suggesting that a speculative theory "may . . . evidence" a Fourth Amendment violation is not a basis for the court to suppress evidence. If the defendant has something more than speculation to show that CS-1 was acting as a government agent, and while acting in that capacity illegally seized documents from him or from Sonag, he should have presented it in the motion, and he should have directly challenged the validity of the warrants on the basis that the affidavits supporting them contained the fruit of an illegal search. Nothing in Judge Jones's decision indicates that he believed the defendant was arguing that the affidavits were based on fruits of an illegal search; he appears to have thought that the defendant was raising the informant-as-government-agent argument solely in the context of the informant's reliability. See Dkt. No. 80 at 14 (finding that the defendant's speculation that CS-1 was acting as a government agent "does not seriously undermine CS-1's reliability").

More to the point, this argument does not support the conclusion that the defendant (or Sonag) has standing to challenge the searches of the accountant's home office or the offices of C3T or Pagasa. The argument implies

that because the defendant (or Sonag) owned the allegedly illegally-seized documents, the defendant (and Sonag) have standing to challenge the searches of any of the locations in which the allegedly illegally-seized documents were found. This is an iteration of the "automatic standing" rule of <u>Jones v. United States</u>, 362 U.S. 257 (1960), which the Supreme Court overruled twenty years after its articulation.

In <u>United States v. Salvucci</u>, 448 U.S. 83, 84-85 (1980), the Supreme Court reviewed a First Circuit ruling that "since respondents were charged with crimes of possession, they were entitled to claim 'automatic standing' to challenge the legality of the search which produced the evidence against them, without regard to whether they had an expectation of privacy in the premises searched." In reversing that decision, the Court stated, "[t]he person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation." <u>Id.</u> at 91. The Court went on to explain, "While property ownership is clearly a factor to be considered in determining whether a defendant's Fourth Amendment rights have been violated, . . . property rights are neither the beginning nor the end of this Court's inquiry." <u>Id.</u> (citing <u>Rakas</u>, 439 at 144). It said, "[i]n *Rakas*, this Court held that an illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.'" <u>Id.</u> at 91-92 (citing <u>Rakas</u>, 439 U.S. at 140; <u>Mancusi</u>, 391 U.S. 364). The Court concluded, "We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the

area searched." Id. at 92. See also, Rawlings v. Kentucky, 448 U.S. 98, 105-106 (1980). The fact that either Sonag Co., Inc. or the defendant may have owned some documents seized during the execution of the warrants in the space occupied by C3T or Pagasa does not give them standing to challenge the searches of areas in which they had no legitimate expectation of privacy.

Perhaps the defendant means to argue that because he owned the property management company that owned the building on Florist Avenue, he had standing to challenge the search of any area within that building. [4] Without proof that the defendant himself had a legitimate expectation of privacy in the offices of C3T or Pagasa, that argument fails. "[E]ven a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." Rakas, 439 U.S. at 143 n.12 (citing Katz, 389 U.S. at 351, holding that "the Fourth Amendment protects people, not places;" Lewis v. United States, 385 U.S. 206, 210 (1966), holding that a defendant who invited law enforcement into his home had no legitimate expectation of privacy in the drugs located there). The defendant has not argued a nexus between himself and the offices of C3T or Pagasa. He has done the opposite—he has denied any involvement with these businesses.

---

[4] The court does not know how that fact might give rise to an argument that defendant Sonag Co., Inc. had standing; the court does not have information about the relationships between the various entities in which the defendant had ownership interests.

The defendant does not have standing to object to the search of the accountant's home office or the searches of the offices of C3T and Pagasa. Judge Jones found that the defendant has standing to challenge the search of the Sonag Co., Inc. and Nuvo offices. Assuming that Judge Jones was correct, the court turns to the defendant's objections to Judge Jones's rulings on probable cause and the good-faith exception.

C.     Probable Cause

1.     *Legal Standard*

"A search warrant affidavit establishes probable cause when it 'sets forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime.'" United States v. Jones, 208 F.3d 603, 608 (7th Cir. 2000) (quoting United States v. McNeese, 901 F.2d 585, 592 (7th Cir. 1990)). In deciding whether an affidavit establishes probable cause, "courts must use the flexible totality-of-the-circumstances standard set forth in Illinois v. Gates, 462 U.S. 213, 238 , 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)." McNeese, 901 F.2d at 592. This standard requires a practical, common-sense approach; the court asks whether there is a fair probability that contraband or evidence of a crime will be found in a particular place based on all the circumstances set forth in the affidavit. Gates, 462 U.S. at 238. "Probable cause denotes more than mere suspicion, but does not require certainty." United States v. Anton, 633 F.2d 1252, 1254 (7th Cir. 1980).

The district court's duty in reviewing a search warrant and its supporting materials is limited to ensuring "that the magistrate had a 'substantial basis

for ... [concluding]' that probable cause existed." <u>Gates</u>, 462 U.S. at 238–39

(quoting <u>Jones</u>, 362 U.S. at 271). In other words,

> a magistrate's determination of probable cause is to be "given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated."

United States v. Pritchard, 745 F.2d 1112, 1120 (7th Cir. 1984) (quoting <u>United States v. Rambis</u>, 686 F.2d 620, 622 (7th Cir. 1982)). Even "doubtful cases should be resolved in favor of upholding the warrant." <u>Rambis</u>, 686 F.2d at 622.

    2.    *Discussion*[5]

The defendant's objections relate only to the reliability of the information the affidavits attributed to CS-1. The defendant argues the affidavits did not provide enough information to allow Judge Jones to fully assess the credibility of CS-1, because they did not say what position CS-1 had held with Sonag and

---

[5] The defendant did not object to Judge Jones's decision denying his request for an evidentiary hearing. The court finds that Judge Jones did not commit clear error in denying the request. A defendant is entitled to a <u>Franks</u> hearing only where he makes a substantial preliminary showing that (1) the affidavit contained a false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause. <u>United States v. Maro</u>, 272 F.3d 817, 821 (7th Cir. 2001). This standard also applies when an affidavit is challenged on the ground that facts were omitted. <u>See, e.g.</u>, <u>United States v. Williams</u>, 737 F .2d 594, 604 (7th Cir. 1984). The defendant did not meet his burden, for the reasons the court discusses in its probable cause analysis.

Nuvo. Dkt. No. 84 at 2. He repeats his argument that the affidavits presented CS-1's information as fact rather than as the informant's opinions or beliefs. Id. He re-asserts his argument that the report uses the active voice to make it sound as if CS-1 had first-hand knowledge of certain facts and events, when the reports of the interviews the agents conducted with CS-1 used a passive-voice construction that made it less clear that CS-1 was relating information of which he/she had first-hand knowledge. Id. He repeats that the "application for the search warrant did not disclose that some of the business records (which are summarized in the application) were taken by the confidential informant, without authority." Id. at 3-4. And he reiterates that the exclusionary rule "ought not be trumped by the good faith exception." Id. at 5.

The court begins by noting that the defendant argues as if the government had presented Judge Jones with an affidavit that said, in essence, "here is some information from a person whom we decline to identify; just trust us that this unidentified person is reliable and truthful." Judges sometimes *are* presented with such affidavits in support of search warrants. This court has seen affidavits in which agents seek to search a location based on a single, unidentified informant's statements to the agents that a suspect stores guns there, and that the informant saw the guns at that location two days earlier. In that circumstance, more detailed information about the informant is critical to the court's probable cause determination, because the court has nothing other than the informant's information upon which to rely.

The circumstances in this case are different. The affidavit in this case *did not* rely solely on CS-1's information. While the defendant focuses his criticism's only on CS-1's reliability, the affidavit contains information from many other sources—other informing individuals, bank records, tax records, telephone records, and state databases. The Supreme Court made clear in Gates that "[t]he task of the issuing magistrate is simply to make a practical common-sense decision whether, *given all the circumstances set forth in the affidavit before him*, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238 (emphasis added). While the defendant focuses only on the reliability of CS-1, Judge Jones had much more information than that supplied by CS-1 (or attributed to CS-1) upon which to base his determination. So does this court. *This* court's job is "simply to ensure that [Judge Jones] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. (citing Jones, 362 U.S. at 271.

That said, the Supreme Court has directed that "when an affidavit relies on information supplied by an informant, the issuing judge must consider whether the information is reliable." United States v. Johnson, 655 F.3d 594, 600 (7th Cir. 2011). As Judge Jones noted, there are five factors courts must consider when determining whether the information supplied by an informant is reliable: (1) the level of detail; (2) the extent of firsthand observation; (3) the degree of corroboration; (4) the interval of time between the reported events and

the warrant application; and (5) whether the informant appeared before the issuing judge. United States v. Glover, 755 F.3d 811, 816 (7th Cir. 2014) (citing Johnson, 655 F.3d at 600). "[N]o one factor necessarily dooms a search warrant." Id. (citing Johnson, 655 F.3d at 600). On the other hand, "[c]ases that test the sufficiency of affidavits for warrants obtained based on informants are highly fact-specific, but information about the informant's credibility or potential bias is crucial." Id. Looking at these factors, the court concludes that the affidavits provided no indication the information attributed to CS-1 was not reliable, and to the extent that Judge Jones relied on that information, it—along with all the other information in the affidavits—provided him with a substantial basis for concluding that probable cause existed.

Level of detail: The information the affidavits attributed to CS-1 provided a high level of detail about the alleged crimes. It discussed the alleged events surrounding the 8(a) certification application process; who the defendant approached to run Nuvo, C3T and Pagasa; who actually controlled each of the companies; how Michaud controlled the Nuvo email; who appeared on the payroll but didn't work for the companies; how the companies provided repairs and additions for the defendant's and Hubbell's personal residences; how Hubbell "left" C3T but moved into an office behind C3T's office suite so that he could continue to run the company; how Hubbell created a work history for Pagasa; and Michaud's role in controlling the entire ledger function and financial accounts for all of the companies. Id. at ¶¶31, 32, 38, 40, 52, 54, 55, 56, 57, 60, 63, 64, 71, 82, 92, 93, 111, 122, 127 and 128.

The defendant points out that some of that detail comes from information the agents obtained from business records. As examples, he lists ¶47 (referring to "[a] review of available financial records from Nuvo"), ¶59 (referring again to Nuvo's financial records), ¶64 (referring to an "internal Nuvo accounting document" provided by CS-1), ¶65 (referring to Nuvo's financial records), ¶84 (referencing a review of "both C3T's and Agoudemos' financial records"), ¶95 (referring to "the subcontractor lists that C3T had submitted to [the VA's Center for Verification and Evaluation]") and ¶114 (referring to Pagasa's financial records). Dkt. No. 39 at ¶14.

According to the suppression motion, the investigative reports reflect that CS-1 provided the investigators with documents such as "records, including emails, financial records and internal accounting records." <u>Id.</u> at p. 7, ¶15.[6] The motion contends that "[o]ver time, and following numerous meetings, the documents that were provided to law enforcement became more and more specific to law enforcement's needs . . . ."[7] <u>Id.</u> at p. 8, ¶15. For example, he says that during one meeting in 2014, CS-1[8] provided agents with internal Nuvo emails and information from Nuvo's internal accounting system. <u>Id.</u> at ¶16. The

---

[6] The motion contains two paragraphs numbered 15, so the court includes the page number to distinguish between the two.

[7] The defendant refers to "numerous meetings" between CS-1 and the agents, while the government has asserted that CS-1 met with agents only three times—December 2013, February 2014 and March 2014. Dkt. No. 60 at 14.

[8] The motion says that the person who provided the government with the Nuvo documents was identified as CS-CH-0010, and argues that the defendant believes that this person is CS-1. Dkt. No. 39 at ¶16 and p. 8, n.4. The government confirmed in its response that CS-CH-0010 and CS-1 are the same person. Dkt. No. 60 at 14.

defendant says that "in a subsequent meeting," CS-1 met with agents from the VA's office of the inspector general, and "provided information . . . drawn from internal, non-public company records, including emails and financial records," about "Ganos controlled entities." Id. at ¶17.

The defendant interprets this chronology as evidence that "investigators directed the confidential informant to obtain information and to report about the existence of records that substantiated the investigator's suspicions." Id. at ¶19. He then asserts that "[w]hether the confidential informant provided investigators with non-public records of the company, and whether this occurred at the direction of government agents goes to the Magistrate Judge's assessment of the credibility of the informant." Id. at ¶19. Judge Jones dismissed this argument because the defendant had offered nothing more than speculation to support it, and concluded that "such speculation does not seriously undermine CS-1's credibility." Dkt. No. 80 at 14.

In his objection to Judge Jones's recommendation, the defendant goes further, asserting that "a taking of non-public documents performed with the intent to aid investigators and with the government's knowledge is a joint endeavor, it is a search under the Fourth Amendment." Dkt. No. 84 at 3. He says, "[w]here the government knew of and acquiesced in the intrusive conduct and the confidential informant's purpose for conducting the search was to assist law enforcement efforts, it is reasonable to conclude that the Fourth Amendment proscription against unreasonable, warrantless searches and seizures has been violated." Id. at 4. This is not an argument about CS-1's

credibility or reliability. It is a tortured conflation of the "instrument-or-agent" ground for mounting a Fourth Amendment challenge to evidence obtained from a search by a private party with the question of whether an informant who allegedly acted as an instrument or agent is reliable—and it is a red herring.

The defendant cites United States v. Feffer, 831 F.2d 734 (7th Cir. 1987). The defendants in Feffer moved to suppress documents that a private party had provided to the government on the ground that the government's subsequent actions had "transformed" the private party into an instrument or agent of the government, rendering her private search subject to the restrictions of the Fourth Amendment. Feffer, 831 F.2d at 737. Citing Coolidge v. New Hampshire, 403 U.S. 443 (1971), the Seventh Circuit stated that "if in light of all the circumstances a private party conducting a search must be regarded as an instrument or agent of the government, the fourth amendment applies to that party's actions." Id. It found that there were two critical factors for a court to consider in determining whether the private party was acting as an "instrument or agent" of the government for Fourth Amendment purposes: "whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends." Id. at 739.[9] The district court had concluded that the private party's actions were not the result of government inducement; the Seventh Circuit declined to disturb that factual

---

[9] See also, United States v. Shaid, 117 F.3d 322, 325 (7th Cir. 1997).

conclusion and affirmed the district court's denial of the motion to suppress. Id. at 739-40.

But the defendant has not asked the court to suppress the evidence seized during the search of the C3T and Pagasa offices on the ground that the search was conducted by a private party acting as an instrument or agent of the government. Nor has he asked the court to suppress specific documents on the ground that they were provided to the government by someone acting as its instrument or agent. The defendant has asked the court to suppress the evidence seized from the offices of C3T and Pagasa for one reason: because the affidavits did not provide Judge Jones with a sufficient basis for determining that there was probable cause to search those locations. His purely speculative assertions that CS-1 *may* have been acting as an instrument or agent of the government when he/she provided the agents with documents and records that *may* have been the records the affiant references in the affidavits and which CS-1 *may not* have been authorized to take is befuddling and irrelevant to the probable cause determination.

The issue is whether the information that the affidavits attribute to CS-1 was reliable. The defendant's theory that "the guiding hand of government agents [was] directing the informant to purloin specific internal, non-public company records for their use in establishing probable cause" is not relevant to whether the detailed information the affidavits attribute to CS-1 was *reliable*. Even if CS-1 didn't have the authority to possess some of the documents that he/she gave the agents, and even if he/she took the documents at the direction

of the agents, those facts would not impact the *reliability* of his/her information. It might show that he/she did not have a working knowledge of Fourth Amendment jurisprudence. It would not demonstrate that his/her detailed information was not reliable.

A couple of the defendant's statements in the context of the "instrument-or-agent" distraction would be relevant to CS-1's credibility or reliability, were they not rampant speculation. The objection asserts that "[n]ot[h]ing in the investigator's reports supports the conclusion that the informant was driven by altruistic reasons or a corporate policy of disclosure." Dkt. No. 84 at 4. From here, the defendant makes the following leap: "Indeed, under the circumstances, it is reasonable to conclude that the informant was motivated to exculpate him/herself and, potentially, to seek a financial reward." Id. The court disagrees with the defendant's assessment of the reasonableness of this pulled-out-of-thin-air conclusion.

To circle back to the actual issue: the level of detail in the information attributed to CS-1 supports a finding that CS-1's information was reliable.

The extent of firsthand observations: Paragraph 31 of the affidavits explains that CS-1, having worked at Sonag and Nuvo for some fourteen years, had firsthand knowledge of the reported events. The affiant stated that this gave CS-1 "an intimate knowledge of specific contract details, office culture, and financial transactions." Id. The original motion to suppress argues that the affidavits do not identify CS-1's position with the companies, asserting that the affidavits did not "distinguish whether the informant was the janitor or the

chief financial officer." Dkt. No. 39 at ¶7. Whether CS-1 was the janitor or the CFO might have impacted the extent to which he/she understood certain events that he/she observed, but either position would have enabled a fourteen-year employee to make a good many first-hand observations. And, as the court has noted, the affidavits provided corroboration for much of the information CS-1 provided, regardless of his/her position.

The defendant argues that information he obtained through discovery raises questions about whether the information the affidavits attribute to CS-1 really came from CS-1. First, he states that the affiant "recount[ed] as fact information provided by the confidential informant." Dkt. No. 39 at ¶10. The defendant asserts that in contrast, the interview reports in which the investigating agents memorialized their interviews with CS-1 "use phrases that showed the informant 'believes' or that facts 'reportedly' occurred." Id. The defendant says that "[w]hile the report of interview suggests that the confidential informant may not have been present when relevant information was discussed," the wording of the affidavit leads the reader to conclude that CS-1 reported facts he/she had observed, or for which he/she had proof.

The defendant also argues that in the interview reports, the authors used the passive voice, making it hard to determine whether CS-1 was relating facts based on his/her own observations, or information he/she had heard from others, or his/her beliefs and opinions. In contrast, the defendant argues, the affidavit used the active voice, identifying CS-1 as the provider of the information.

34

The defendant used paragraph 71 of the affidavit as an example.

Paragraph 71 of the affidavit says,

> CS-1 reported that after Nuvo was established, Hubbell and Ganos wanted to create a SDVOSB in order to participate in the new SDVOSB government set-aside contract program through the VA. As a result, in 2006, Hubbell and Ganos selected and placed Telemachos "Tim" Agoudemos, a service-disabled veteran, in the position of President of C3T to qualify for the SDVOSB program.

Dkt. No. 39-1 at ¶71. The defendant asserts that investigative report from which that paragraph came reads as follows:

> After Nuvo was established, **it is believed** that Hubbell and GANOS wanted to create a service-disabled veteran-owned small business (SDVOSB) in order to participate in the new SDVOSB government set-aside contract program through the VA. As a result, Hubbell and GANOS selected and placed Telemachos "Tim" Agoudemos, a service, disabled veteran, in the position of President of C3T in order to qualify for the SDVOSB program.

Dkt. No. 39 at ¶11. The defendant contends that "[s]imilar formulations occur more than 40 times in the interview of the confidential informant." Id. at ¶13.

These syntactical arguments, like the defendant's "informant-as-instrument-or-agent" argument—are not relevant to CS-1's *reliability* as an informant. They imply that the *affiant* did something to mislead Judge Jones, not that CS-1 was not reliable. These arguments really go to the application of the good-faith exception.

The extent of first-hand observations in the affidavit—which are the only things that were before Judge Jones when he was assessing probable cause—weigh in favor of  CS-1's reliability.

The degree of corroboration: This factor weighs heavily in favor of the informant's reliability. The affiant provided corroboration for much of the

information attributed to CS-1. The affidavits include information from Wisconsin DFI records, SBA applications and documents, Lopez's tax returns, Minnesota Driver's license records, Verizon telephone records, bank account statements, statements from another Nuvo employee, property records, information from the Federal Procurement database, information from a former C3T employee, Waukesha County Register of Deeds financial and real estate records, C3T's W-2 statements, Nuvo and C3T bank accounts, Michaud's interview and the Wyoming Secretary of State's Corporate records.  Id. at ¶¶33, 35, 37, 42, 43, 45, 46, 47, 48, 49, 53, 58, 59, 61, 62, 66, 67, 78, 79, 97, 99, 106, 116, 125 and 129. To reiterate: this is not a case in which the agents relied solely on the word of a single confidential source in asking Judge Jones to authorize the warrants; Judge Jones did not have to rely solely on information provided by CS-1 to determine whether probable cause existed, and he said as much in his report and recommendation.

The interval of time between the reported events and the warrant application: The affidavits indicated at ¶31 that CS-1 approached law enforcement in 2014. The government stated in its response to the motion to suppress that the CS met with law enforcement in December 2013, February 2014 and March 2014. Dkt. No. 60 at 14. The affiant did not file the warrant applications until July 2016, over two years after CS-1's last meeting with the agents.

Judge Jones found that this factor "weigh[ed] slightly against the reliability of CS-1's information." Id. This court is not so sure. The passage of

time can reduce the reliability of an informant's information in some circumstances—for example, an informant who tells law enforcement that she saw drugs in a suspect's basement two days ago provides more reliable information than one who says she saw drugs in the basement two years ago. It is the nature of illegal drugs to disappear quickly. Time is less likely to have a degrading effect on evidence of financial transactions, particularly transactions which require filings with government agencies, deposits into and withdrawals out of bank accounts and other interactions that leave recorded histories. One of the reasons law enforcement was able to corroborate information from CS-1 is because this case involved that kind of evidence—less ephemeral, and less subject to degrading or disappearing over time.

Whether the informant appeared before the issuing judge: CS-1 did not appear before Judge Jones. Dkt. No. 80 at 13.

Looking at the totality of the circumstances, and considering the strong showing on the level of detail of the information and the amount of corroboration, the court concludes that CS-1 was reliable. The court also concludes that the information from CS-1, along with the information from a variety of other sources reflected in the affidavits, provided Judge Jones with a substantial basis for concluding that probable cause existed to conclude that there was evidence of criminal activity both of the locations the agents searched.

D.    <u>Good Faith Exception</u>

    1.    *Legal Standard*

Courts have recognized a good faith exception to the exclusionary rule. In <u>United States v. Leon</u>, 468 U.S. 897 (1984), "the Supreme Court held that even if a search warrant was invalid because the supporting affidavit failed to support a finding of probable cause, evidence seized in executing the warrant should not be suppressed if the police officers relied in good faith on the judge's decision to issue the warrant." <u>United States v. Miller</u>, 673 F.3d 688, 693 (7th Cir. 2012) (citing <u>Leon</u>, 468 U.S. at 922-23).

"An officer's decision to obtain a warrant is *prima facie* evidence that the officer was acting in good faith." <u>United States v. Reed</u>, 744 F.3d 519, 522 (7th Cir. 2014). "A defendant may rebut this evidence by demonstrating that (1) the issuing judge abandoned the detached and neutral judicial role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer could not reasonably rely on the judge's issuance of it." <u>Id</u>. Evidence should not be excluded unless "the officer could not reasonably have believed that the facts set forth in the affidavit were sufficient to support the magistrate judge's determination of probable cause." <u>United States v. Wiley</u>, 475 F.3d 908, 917 (7th Cir. 2007).

    2.    *Analysis*

The court has concluded that Judge Jones had a substantial basis to conclude that there was probable cause to issue the search warrants. Even if

probable cause had not existed, however, the good faith exception would have applied.

After stating that the good faith exception did not save the affidavits, the motion to suppress reads as follows:

> "[T]he good faith exception to the warrant requirement does not apply in cases, such as here, where the officer seeking the warrant was dishonest or reckless in preparing the affidavit." *United States v. Harris*, 464 F.3d 733, 740 (7th Cir. 2006) (citing *United States v. Dumes*, 313 F.3d 372, 380-81 (7th Cir. 2002)); *United States v. Leon*, 468 U.S. 897, 923 (1994) ("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth.") (citing *Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Simmons*, 771 F. Supp. 2d 908, 927 (N.D. Ill. 2011).

Dkt. No. 39 at ¶22.

Judge Jones concluded that even if the affidavits had not stated probable cause, the executing agents had relied on the warrants in good faith, and the affiant was not reckless or dishonest in preparing the affidavit. In his objection to that conclusion, the defendant did no more than cite again the quote from Leon, followed by the citations for Simmons and Harris. Dkt. No. 84 at 5.

Reading the defendant's pleadings broadly, they allege that the affiant was dishonest or misleading in drafting the affidavits. They allege that the affiant did not disclose that the investigating agents may have obtained some of the documents referenced in the affidavits in violation of the Fourth Amendment, by accepting them from a private party who, possibly acting as an instrument or agent of the government, may have taken the documents without authority. They imply that the affiant failed to disclose CS-1's role with Sonag

and Nuvo to avoid possible questions as to how he or she may have known certain facts. They allege that the affiant may have deliberately worded the affidavits to make it appear as though CS-1 had observed things that he or she may not have observed, or had firsthand knowledge of things that he or she may not have known. They allege that the affiant may have worded the affidavits to state as fact information that was nothing more than the belief, opinion or conclusion of the informant or law enforcement.

These "mays" and "might haves" provide a weak foundation on which to build an assertion that the agent who drafted the affidavits intentionally provided false information, or recklessly disregarded the truth. The court has no basis to believe that this is the case. The court finds that even if the affidavits had not stated probable cause for the searches, the executing agents relied on them in good faith, and the good faith exception would have saved the warrants.

## VI.    CONCLUSION

The court **ADOPTS** the recommendation of the magistrate judge. Dkt. No. 80. The court **DENIES** defendant Brian Ganos's motion to suppress evidence. Dkt. No. 39.

Dated in Milwaukee, Wisconsin this 28th day of February, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**