UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       *Plaintiff,*

    *v.*                                                                  Case No. 18–CR-62 (PP-DEJ)

BRIAN L. GANOS, SONAG COMPANY, INC.,
MARK F. SPINDLER, AND NUVO CONSTRUCTION CO., INC.

       *Defendants.*

## DEFENDANTS' OBJECTIONS TO RECOMMENDATION TO DENY MOTION TO STRIKE JURY VENIRE

## I.

## INTRODUCTION

Sonag Co., Inc., Brian L. Ganos, and Mark F. Spindler all object to the magistrate judge's order denying their motion to strike the jury venire and their request for an evidentiary hearing. Review is *de novo* because the magistrate judge's ruling rests entirely on questions of law. 28 U.S.C. § 636(b)(1)(C).

The Eastern District of Wisconsin systematically and materially omits non-white citizens from its jury pools and overcrowds the pool with white citizens. The defendants made a more than adequate showing to obtain an evidentiary hearing at which they may prove that this disparity violates the Sixth

Amendment. Indeed, the over-representation of whites is as high as 10.8%, and the under-representation of non-whites is as high as 9.74% even before evidence on added effects of the Jury Plan.

The showing here also leads to an inference that bleaching jury pools actually was intended by the government, through its Administrative Office of United States Courts. That inference, if supported at an evidentiary hearing, would warrant relief under the Fifth Amendment's equal protection aspect.

The defendants made a more robust showing than any prior case challenging jury composition in this circuit ever has made, as a predicate for an evidentiary hearing. Statistically, the defendants have demonstrated—even before an evidentiary hearing—that every petit jury in the Milwaukee Division is likely to be short one minority citizen member and likely to be long one white member. As to grand juries, statistically the number is two missing minority jurors, and two extra white ones. The magistrate judge erred in deciding that the defendants do not even deserve to be heard or to present their evidence.

## II.

## OBJECTIONS

### A. *A Hearing, Not a Prima Facie Case.*

By local rule, the Eastern District of Wisconsin lays out the standard for gaining an evidentiary hearing on a motion in a criminal case:

StrangBradley, LLC

> If a motion seeks an evidentiary hearing, the movant must provide in the motion a short, plain statement of the principal legal issue or issues at stake and specific grounds for relief in the motion and, after a conference with the non-movant, provide a description of the material disputed facts that the movant claims require an evidentiary hearing . . .

Criminal Local Rule 12(c) (E.D. Wis.).

Sonag's fourteen-page plus motion to strike the jury venire did not fail to provide a "short, plain statement of the principal legal issue or issues at stake." *See* ECF No. 104. Further, while Sonag did not identify specifically which material factual issues are in dispute, that is because this is a lengthier list of disputed facts than most motions present in criminal cases and it was clear after months of hearings and briefing leading to this motion that the government would dispute all or most material facts.

The motion stated expressly that the entire document was a factual proffer, ECF No. 104 at 2, 15, along with the two affidavits and their attached exhibits. ECF No. 104, ¶11 at 7; Kenneth Strasma Affidavit, ECF No. 105; Kenneth Mayer Affidavit, ECF No. 106. The motion also requested an evidentiary hearing, in its caption and at pages 2 and 14.

In denying an evidentiary hearing and the underlying motion itself, the magistrate judge jumped ahead directly to the *prima facie* case that a movant must make under *Duren v. Missouri*, 439 U.S. 357, 364 (1979). *See* Order at 2, 5 (ECF No. 116). Never citing the standard for obtaining an evidentiary hearing,

StrangBradley, LLC

the magistrate judge instead ruled simply that, "Sonag has failed to make out a prima facie case for challenging this District's jury-selection process" and denied both the request for a hearing and the motion on its merits. ECF No. 116 at 2. The magistrate judge went straight to the *Duren* test before considering whether the movants met the test for an evidentiary hearing—a hearing at which Sonag would take on its burdens under *Duren*.

That was error. The burden-shifting scheme and factual background in *Duren* underscore that error. Assuming that the defendant "establishes" its *prima facie* case, then the burden shifts to the government to "show" that the disproportionate exclusion of a distinctive group "manifestly advance[s] an overriding, significant government interest." *Duren*, 439 U.S. at 367-68; *United States v. Raszkiewicz*, 169 F.3d 459, 463 (7th Cir. 1999); *see also* ECF No. 116 at 5.

Everything about that test and its terms suggests granting an evidentiary proceeding. No party "establishes" anything in a motion. One gains a hearing with a motion. But establishing something requires taking evidence, not just proffering it. In this district, where by rule a motion that seeks an evidentiary hearing does not come with a brief and requires from the government only a response opposing (or conceding by silence) an evidentiary hearing itself, the government could not carry any shifted burden by mere paper, either. Criminal Local Rule 12(c). In *Duren* itself, there was "proof," *Duren*, 439 U.S. at 365, and "hearings," *id.* at 361, at which the petitioner there "established"

StrangBradley, LLC

his *prima facie* case. *Id*. at 361, 364, 366. All of *Duren* suggests, then, that an evidentiary hearing is necessary here.

But Sonag, Ganos, and Spindler never got that chance before the magistrate judge. Their motion exceeded the norms for earning an evidentiary hearing that Criminal Local Rule 12(c) sets. The movants demonstrated that "material issues of fact are in dispute." Moreover, they "present[ed] 'definite, specific, detailed, and nonconjectural' facts that justify relief." *United States v. Owen*, 2016 WL 11448318, at *2 (E.D. Wis. 2016) (Jones, M.J.), quoting *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992); *compare United States v. Witzlib*, 2014 WL 3573410, *4 (E.D. Wis. 2014) (Adelman, J.) for "vague and conclusory" statements that did not warrant an evidentiary hearing (quoting the cursory motion there).

In effect, the magistrate judge granted the government judgment on the pleadings here, in spite of a fourteen-page proffer with two supporting affidavits that laid out in detail not the movants' proof, but what they expect to prove at an evidentiary hearing and why. It is premature to fault the movants for not providing further statistical evidence, ECF No. 116 at 6-7, or for not briefing legal issues, *id*. at 7, or for not proving why and how Professor Kenneth Mayer came to the 9.74% figure that the movants proffered, *id*. at 10, just for example. Under local rule and practice, all of that is for proof at an evidentiary hearing and for legal argument, in writing or orally, after the hearing. As to the

Fifth Amendment claim, Sonag proffered some of the evidence that it would adduce to support an inference of intentional discrimination. Without even hearing that evidence, the district court concluded that it never would draw such an inference, simply because this district takes a statutorily "permissible approach." *Id*. at 15. That reasoning, if accepted here, would obviate the need for any evidentiary proceeding, ever, provided only that the opposing party found some "permissible approach" under statute.

Sonag and the others are prepared to prove the fourteen pages of facts that they proffered, and that the two affidavits portended, at a hearing. But they cannot—and were not obliged to—prove anything in their initial motion. Neither can nor did the government rebut anything or carry a burden of proof simply by opposing an evidentiary hearing.

### B. *Distinctive Groups.*

Among the distinctive groups that the movants described were people of specific ethnicity or race, *see* ECF No. 104 at 1, and racial and ethnic minorities combined; Sonag also described the composite distinctive group as non-whites, minorities, and people of color. ECF No. 104 at 8, 9, 10. However, described, both separately and combined, Sonag alleged that these groups, and the collective group, are under-represented in the jury pool. Importantly, Sonag and the other movants also identified non-Hispanic whites as a distinctive group over-represented in the jury pool. ECF No. 104 at 10-12. Where the Sixth

Amendment requirement is a fair cross-section of the community, obviously either under- or over-representation of groups can defeat that requirement. The constitutional mark is fairness. Too high or too low both can miss that mark.

The magistrate judge addressed only under-representation of minority groups, though; he ignored the proffer of over-representation of non-Hispanic whites and did not address the distinctiveness of that group. *See, e.g.*, ECF No. 116 at 4, 7-11. Faulting Sonag for failing to provide "any authority for its argument" that minorities or people of color are a distinctive group—again, in a motion that is by rule not designed for "authority" or "argument," but rather for identifying and proffering issues for a hearing—the magistrate judge cited four district court decisions dotted across the country in rejecting the basic idea that minorities and people of color are a distinctive group in the community. ECF No. 116 at 7-8.

Sonag turns first to the under-representation issue, and then to over-representation. The magistrate judge's Order erred on both.

1. <u>Divide and Conquer</u>.

According to the "QuickFacts" that the United States Census Bureau makes public, as of mid-year 2017, the United States as a whole was 60.7% non-Hispanic white. Those admittedly are rough estimates: they consider population, not citizenship; and this was 2017, not 2019, for examples. But for purposes here the Court can proceed on the premise that something close to 6

StrangBradley, LLC

out of every 10 American citizens are non-Hispanic whites. Precision does not matter at the moment. What matters for now is that this nation is still a majority, not plurality, white country.

The largest ethnic or racial minority group in the country is Latinos or Hispanics. Again roughly, but close enough for present purposes, 18.1% of the 2017 United States population was Latino or Hispanic, again according to the Census Bureau. All other minority groups come in below that percentage, with Black or African American alone coming in next at 13.4%.

But in a state like Wisconsin, with relatively sparse population and located in the upper Midwest, the percentages of minority groups are lower across the board. Here, again drawing on the same "QuickFacts" from the Census Bureau, the percentage of Hispanics or Latinos drops to 6.9% and the percentage of Blacks or African Americans alone is a closer second, at 6.7%. Asians live in Wisconsin at only half the share they maintain across the country as a whole, 2.9% as compared to 5.8%. And the state is 81.3% non-Hispanic white—one-third again as white as the nation as a whole.

At least while the absolute disparity rule persists, then, assuring the absence of legal barriers to white dominance in jury pools is easy: simply adopt a rule that minorities share no cognizable community of interest, or are invisible collectively. No minority group ever can hit the 10% absolute disparity threshold. So they all may be omitted entirely provided only that the

omission is a regrettable oversight, a glitch, a statistical blip, an awkward accident that suggests only that "[p]erhaps [the Jury Plan] could be better;" provided, in other words, that the omission is the result of any reason in the world other than what a court would admit is intentional racial discrimination. A court needs only to divide to conquer, in short.

That is exactly what the four district courts the magistrate judge cites did, in effect. By dividing minorities into separate groups having no cognizable shared interests or identity, and only by doing that, each court could excuse a failure to compose jury pools that in fact mirrored reasonably the actual community as a whole. The effect every time is to ratify jury pools that are disproportionately white. This divide-and-conquer rule never once seems to have been employed to ratify an over-sampling of any non-white group.

All of that reasoning comes from a federal judiciary that itself is disproportionately white. As the Federal Judicial Center notes, "For more than a century and half, the Article III judiciary was composed exclusively of white judges." The color line was not breached until 1945, when Irvin Mollison joined the U.S. Customs Court. www.fjc.gov/history/exhibits/graphs-and-maps/race-and-ethnicity (last accessed March 24, 2019). Even with the most recent available numbers, from 2017, 1,070 of the nation's 1,337 federal judges remain white; only 148, or 11.07%, are black or black Hispanic. Hispanic judges numbered only 88 that year, so the nation's largest ethnic minority contributed only 6.58% of the

StrangBradley, LLC

nation's federal judges. If anything, incidentally, the disparities seem for the moment to be worsening. Of the 13 new federal judges confirmed in 2017, 100% were white according to the Federal Judicial Center website. So in 2017, the American federal judiciary remained 80.03% white: minorities as a whole were about one-third under-represented.

What does it mean? It means at least that, even if now were the right time to consider whether minorities together are a distinctive group in the community (it is not: narrowly, now is the time only to consider whether Sonag and the other movants should be heard), this Court would have good reason to reject the four, isolated district court decisions that have accepted the government's divide-and-conquer defense of overly white jury pools. Not one binding decision requires this Court to continue down that path of disparate exclusion, rather than choose a path of greater inclusion on juries.

And it is not like Sonag made up the notion of grouping racial and ethnic minorities. Sociologists, political scientists, epidemiologists, educators, historians, criminologists, economists, pollsters, social media and online retail businesses, and any number of other social scientists and professionals routinely consider minorities both by subgroups and as one group. The term "people of color" hardly is Sonag's; it is part of the popular lexicon and pervades the culture. In common parlance, Americans of every political stripe and other description refer to "minorities" or "people of color" or "non-whites,"

StrangBradley, LLC

or all three, with great frequency. In a country in which one group, whites or Caucasians (itself an amalgam, incidentally, of European and Scandinavian ethnicities) represents an outright majority and has since nationhood and before, every group not in that majority necessarily shares a community of interest. A failure of racial and ethnic minorities to find common cause and to identify in contradistinction to the majority group would be to risk invisibility in social and political institutions and processes. Indeed, four district courts were willing to impose that invisibility *de jure* for purposes of a fair cross-section challenge.

> 2. <u>Whites</u>.

Again, the magistrate judge simply overlooked Sonag's other express basis of relief: that whites are over-represented in Eastern District of Wisconsin jury pools. ECF No. 104 at 1, 2, 6, 78, 11-12, 14. Indeed, depending on whether one uses the most conservative geocoding and surname analysis figures that one Sonag expert compiled (which give the government the benefit of every doubt by assuming that all uncertain identifications are treated as minority group members), or less conservative figures that distribute uncertainty proportionately, the over-representation of non-Hispanic whites is between 5.6% and 10.8%. ECF No. 104 at 6-7, ¶¶10.c, 10.d. Obviously, either over-representation or under-representation can destroy or compromise a fair cross-section: too many of one is no different than too few of another.

And whites clearly are a distinctive group in the community for Sixth Amendment purposes. *See Roman v. Abrams*, 822 F.2d 214, 227-28 (2d Cir. 1987), *cert. denied*, 489 U.S. 1052 (1989) (holding that whites are a cognizable group for Sixth Amendment fair cross-section purposes); *Government of Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir. 1989) (use of peremptory challenges to remove all whites from jury was plain error; Sixth Amendment applies to both blacks and whites); *Gilchrist v. State*, 97 Md. App. 55, 75-76, 627 A.2d 44, 53-54 (Md. Ct. Spec. App. 1993) (same). There is no logical reason that whites would be a group any less distinctive in the community than other racial or ethnic groups. The fact that whites are the majority group in this district, and in the country generally, makes them if anything more distinctive, not less. Whites are dominant as a group; over-representing them in the jury pool only exacerbates that problem. As the Second Circuit put it in *Roman*, "The State's contention that White persons do not constitute a cognizable or distinctive group for Sixth Amendment purposes need not detain us long." *Roman*, 822 F.2d at 227.

C.      *Absolute Disparity.*

While he acknowledged that the proffered under-representation is "much closer to the threshold" of a 10% absolute disparity than earlier cases have been, the magistrate judge thought himself bound by *United States v. Ashley*, 54 F.3d 311, 313 (7th Cir. 1995), and its absolute disparity test. ECF No. 116 at 9-11. He then ignored the white over-representation claim, where movants exceed the

StrangBradley, LLC

10% threshold under one variant of geocoding and surname analysis. ECF No. 104 at 7, ¶10.d.

      1.    <u>Whose Precedent First</u>?

At one level, the movants more than understand the magistrate judge's dilemma with the absolute disparity test. The Seventh Circuit has not had to consider the issue squarely since *Berghuis v. Smith*, 559 U.S. 314 (2010), so absolute disparity remains the presumed rule in this circuit.

But as the movants noted, after *Berghuis*, that test inevitably will have to change. ECF No. 106 at 10-11, ¶18. The *en banc* Ninth Circuit has conceded this and dropped the absolute disparity test. *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1157-65 (9th Cir. 2014). Even the Seventh Circuit has not relied expressly on that test since *Berghuis*. *See United States v. Willis*, 868 F.3d 549, 555 (7th Cir. 2017); *United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014); *United States v. Moreland*, 703 F.3d 976, 982 (7th Cir. 2012). Although movants cited these more recent cases, the magistrate judge did not. He relied on pre-*Berghuis* Seventh Circuit cases. *Compare* ECF No. 104 at 11, ¶18, *with* ECF No. 116 at 9-11.

While district courts in this circuit of course must bend to Seventh Circuit precedent, they have a higher order of obedience: they first must follow Supreme Court precedent. And *Berghuis* dooms the absolute disparity test as the sole gateway to relief on a fair cross-section claim under the Sixth

StrangBradley, LLC

Amendment. The Seventh Circuit rule will have to change. That court as readily can accept the change by affirming a district court decision that recognizes the inevitable, as by reversing a district court that resists it. This Court's first duty is to follow *Berghuis*, with affirmation by the Seventh Circuit to come later.

        2.    <u>Meeting 10% Anyway</u>.

Even if the Seventh Circuit's absolute disparity test could persist after *Berghuis* in some way, this Court should acknowledge that the movants may meet the 10% threshold here at the pre-hearing stage. As their motion and the supporting affidavits demonstrate, the under-representation of minority groups together is 9.74% if the most conservative (or pro-government here) assumption is removed. That rounds to 10%. Rejecting this fair cross-section challenge now, before a hearing, because the movants may fall 0.26% short of meeting the absolute disparity threshold would be unwise. Especially after *Berghuis*, the chances that the absolute disparity test could remain in such rigid application seem about nil. Plus, the Court has not even heard evidence yet about the effects of the opt-out for single parents and the process for those without internet access. ECF No. 104 at 2-3.

And again, with the same conservative assumption removed from the geocoding and surname analysis, the over-representation of non-Hispanic whites rises to 10.8%. That clearly exceeds the threshold even on its most rigid terms. *See* ECF No. 106 at 6-7, ¶¶10.c, 10.d.

StrangBradley, LLC

## D. *Statutory Allowance* **vs.** *Constitutional Imperative.*

The magistrate judge is right, of course, that "the Jury Selection and Service Act explicitly endorses the use of actual voter lists as a primary source of names of prospective jurors." ECF No. 116 at 12, citing 28 U.S.C. § 1863(b)(2). In and of itself, too, the use of actual jurors as a primary source for juror names does not violate *Duren*. *Id*. The movants can concede this.

But those observations hardly close the Fifth and Sixth Amendment questions here, as the magistrate judge seems to have thought they did. Yes, the starting point for assembling a jury pool may be actual voter lists, as a matter of statutory permission or invitation; but the ending point, a jury pool that in fact represents a fair cross-section of the citizen community in the district is a constitutional imperative instead. What a statute treats permissibly at the outset cannot and does not override a constitutional mandate at the end of the process. When they cannot be reconciled in application, a statute yields to the constitution. That is basic. U.S. CONST. Art. VI (Supremacy Clause); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 159 (1819) (state statutes may not interfere with the United States Constitution).

The magistrate judge's reliance only on what a statute permits at the front end was premature, then. For the constitutional imperatives at the back end well may remain unsatisfied. ECF No. 116 at 12, 15. He mistook a statutorily allowable starting point for a constitutionally acceptable ending point.

StrangBradley, LLC

E.    *Fifth Amendment Claim.*

The idea that Sonag or the movants must show that corporations are a distinct group that is substantially under-represented on juries is, well, mistaken. *See* ECF No. 116 at 114.  Brian Ganos is and has been since the beginning a co-movant here.  He is a Latino, as the government itself does not dispute.  The under-representation of voting-age, citizen Latinos is one aspect of the claim here.  Latinos are a distinctive group and, for the reasons explained above, movants believe that they can establish that Latinos specifically and non-white minority groups generally are unconstitutionally under-represented in this district's jury pools.  Ganos is akin to the respondent in the foundational case of *Castaneda v. Partida*, 430 U.S. 482 (1977), in which a Mexican-American criminal defendant made a successful challenge on federal habeas corpus under the Fourteenth Amendment to the deliberate under-representation of Mexican-Americans on the grand jury that indicted him.

Moreover, an equal protection movant under the Fifth Amendment need not belong to the under-represented group.  *See Peters v. Kiff*, 407 U.S. 493, 496-504 (1972) (a white defendant had standing to raise a Fourteenth Amendment due process challenge to the systematic exclusion of blacks from grand and petit juries); *Powers v. Ohio*, 499 U.S. 400 (1991) (a white defendant has standing under the Fourteenth Amendment's equal protection clause to raise a *Batson* challenge against discriminatory use of peremptory strikes to remove

StrangBradley, LLC

black jurors).  While *Peters v. Kiff* and *Powers v. Ohio* raised Fourteenth Amendment challenges to state proceedings, *a fortiori* their reasoning applies to Fifth Amendment challenges to federal proceedings.  Sonag, Ganos, and Spindler all have standing to seek relief under the Fifth Amendment here if there is intentional government discrimination against any racial or ethnic group.

And they proffered reasons to suspect or to infer, in the end after an evidentiary hearing, exactly that discriminatory animus, probably in the Administrative Office of United States Courts.  *See* ECF No. 104 at ¶¶12-16, 21-24.  Until early 2017, this district used registered voters, not actual voters, from the only county in the Milwaukee Division that has any substantial minority population, Milwaukee County.  Registered voters are a pool more representative of the community than actual voters, as the movants proffered.  ECF No. 104 at ¶22.  Until 2017, too, the Jury Plan expressly allowed the Clerk of Court to oversample areas in Milwaukee County with high minority concentrations, to assure a representative jury.  In 2017, on advice of the AOUSC, the court abandoned both of those provisions in favor of using actual voters only in all of the division's counties, which provably and clearly will bleach the jury pool.  In reverting to exclusive practical use of actual voters from which to draw names for the master jury wheel, this federal district turned in a direction opposite to the direction of urban state courts in recent decades: those courts often have advanced to source lists for jurors beyond voter rolls—looking at

StrangBradley, LLC

registered rather than actual voters, drivers' license lists, utility customers, and other sources to improve inclusion in jury panels—rather than retreated to the use of actual voter lists only.

Then, for reasons almost inexplicable other than by discriminatory animus, this district's new Jury Plan allocates county shares in the master wheel not by the voting-age citizen share that each of the division's 12 counties contributes to the voting-age citizen population of the division as a whole, but instead by the share of actual voters in November general elections that each county contributed to the voter total of the division. In other words, affluent, heavily white counties in the division (with the highest voter turnout percentages) claim a share of the master wheel well beyond their aliquot share of the voting-age citizen population total; and Milwaukee County (with the only sizable minority population but also the lowest voter turnout percentage) gets slighted in the master wheel, with well below its aliquot share of the eligible voting-age citizen population.

What possible reason other than under-representing Milwaukee County residents in federal jury pools could there be for that formula? Reliable United States Census Bureau figures, updated annually with the American Community Survey, are easily and publicly available to assign each county its proportional share of voting-age eligible citizens for master jury wheel purposes. It is not even necessarily easier to calculate proportional county shares of the

whole by voter turnout percentages. Yet the new Jury Plan chooses a formula that, in the Milwaukee Division, predictably and measurably gives an advantage to residents of affluent white counties, and gives a disadvantage to residents of comparatively much more diverse and less affluent Milwaukee County.

Further, the district made these changes right after the first November general election in which Wisconsin's restrictive voter identification requirements, found in Act 23, applied. Again, movants proffered evidence that those voter identification requirements in fact reduced minority voting participation, exacerbating the gap between eligible citizen minority population and eligible citizen minority voting. That gap and discriminatory effect are what a member of this court, the Hon. Lynn Adelman, made detailed factual findings on five years ago, after a trial. *Frank v. Walker*, 17 F. Supp.3d 837 (E.D. Wis. 2014), *rev'd*, 768 F.3d 744 (7th Cir. 2014).

In sum, an inference of intentional discrimination against minority groups in the jury pool selection process well may be available reasonably, or even may be quite compelling, after an evidentiary hearing here. The fact that the Jury Plan starts with a statutorily allowable choice to use actual voters as a *primary* source of names hardly forecloses that inference in the end, as the movants explained in part II.D above.

StrangBradley, LLC

# III.

# CONCLUSION

Sonag, Ganos, and Spindler should have a hearing, at a minimum, on their motion to strike the jury venire and their request for an evidentiary hearing. At this stage, the issue is not whether they win. It is whether they have an opportunity to offer their proof at all. They made a substantial preliminary showing that non-white citizens are under-represented systematically and significantly in this district's jury pools, and that whites correspondingly are over-represented. Both effects deny a fair cross-section of the community. The impact is not trivial: even at the median figures that the defendants and their experts calculated, one of every twelve seats in the petit jury box will be filled by a white juror, but would be filled instead by a non-white juror if the community were fairly represented in cross-section. On grand juries, two non-white jurors statistically lose their seats to white grand jurors.

The Seventh Circuit's absolute disparity rule, which excuses this disparity every time, cannot survive the Supreme Court's decision in *Berghuis v. Smith*. The *en banc* Ninth Circuit has acknowledged that as to its prior absolute disparity rule, and the conclusion is unavoidable. While this Court ordinarily must abide Seventh Circuit precedent, its first duty is to accept Supreme Court precedent. At the very least, that requires an evidentiary hearing here.

StrangBradley, LLC

Sonag and the others (including Ganos, a non-white Hispanic and a co-movant here from the outset) also proffered more than enough to support a hearing at which they can adduce evidence that will support an inference of intentional discrimination against non-white jurors, and in favor of white ones, if this Court in the end wishes to draw that inference. The defendants should have an evidentiary hearing on their Fifth Amendment claim under *Castaneda* as well.

At bottom, the issue is not whether this Court can do better in jury selection. The issue is that it must. Movants earned a right to prove that.

Dated at Madison, Wisconsin, March 26, 2019.

Respectfully submitted,

SONAG CO., INC., *Defendant*


*/s/ Dean A. Strang*

Dean A. Strang
*Wisconsin Bar No. 1009868*
John H. Bradley
*Wisconsin Bar No. 1053124*

STRANGBRADLEY, LLC
33 East Main Street, Suite 400
Madison, Wisconsin 53703
[608] 535-1550
dean@strangbradley.com