UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                          Case No. 18-CR-62

BRIAN GANOS,

        Defendant.

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits this memorandum for the December 16, 2019 sentencing of defendant Brian Ganos. Ganos orchestrated a massive, twelve-year fraud scheme that obtained over $260 million in government contract payments through deceit. *See* Gov't Ex. 3.[1] In the 1990s, Ganos had some legitimate success in building Sonag Company with the help of government programs that set aside contracts for minority-owned small businesses. But then Ganos abused those very same programs by creating front companies to gobble up set-aside contracts to which he was not entitled. As a result, Ganos deprived bona fide minority-owned and disabled veteran-owned small businesses from opportunities to become established. Worse, Ganos maintained the fraud by engaging in brazen lies and obstruction of government inquiries into the front companies. Along the way, Ganos enriched himself lavishly, enjoying an enormous house on Muskego Lake (with its indoor pool), a condo for skiing in Colorado, a classic car collection, and frequent trips to casinos.

---

[1] The government submitted 26 exhibits to the U.S. Probation Office, which it used to prepare the Presentence Report ("PSR"). *See* Doc. 215-1, at 1. The government is submitting those exhibits directly to the Court with this memorandum, which cites certain of the exhibits.

For the reasons given below, the United States respectfully requests that the Court impose a sentence of 78 months; a period of supervised release; a fine of $5,000; a special assessment of $200; and all the forfeiture terms set forth in the Court's August 5, 2019 Preliminary Order of Forfeiture (R. 200). Those forfeiture terms include the imposition of a $500,000 money judgment of forfeiture and the forfeiture of seven specified substitute assets in full satisfaction of that money judgment. Those substitute assets to be forfeited consist of two Disney time share interests, four vehicles, and approximately $60,000 in currency that the United States is now holding in escrow.

### I.      The Guidelines Range Should Exclude Acceptance of Responsibility, and the Court Should Depart Downward by 8 Levels to Reflect a Lower Loss Amount

In fashioning a sentence, the Court should begin "by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) (quoting *Gall v. United States,* 552 U.S. 38, 49 (2007)). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. The United States' positions on the Guidelines' calculation are set forth in the PSR addendum. *See* Doc. 215-1, at 33-38. The government does not repeat those points here, except that the government argues more fully below that (a) Ganos should not receive credit for acceptance of responsibility, and (b) the Court should adopt a lower loss amount through a downward departure.

#### A.      Ganos Has Not Fully Accepted Responsibility for His Fraud

Ganos should not receive credit for acceptance of responsibility for several reasons. First and foremost, Ganos engaged in obstruction of justice, as detailed in the PSR. PSR ¶¶ 138-149. Second, although Ganos pleaded guilty before trial, he did so only after engaging in protracted pretrial litigation—including a challenge to the district's jury plan—and only when the trial date drew close. The government expended substantial resources to litigate this case and prepare for

trial, after having expended substantial resources to investigate Ganos's fraud, having to overcome his obstruction. Finally, even for this sentencing proceeding, Ganos continues to falsely deny responsibility with regard to C3T's part of the scheme.

Specifically, in his September 30, 2019 submission, Ganos asserts that he "did not operate or control" C3T. Doc. 203, at 14. He maintains that "[a]s to C3T, Pagasa, and other entities, Ganos has and had strong claims of innocence." *Id*. That is demonstrably false. The PSR sets forth specific facts that show Ganos exercised ultimate control over C3T and Pagsa. *See* PSR ¶¶ 73-103. Contemporaneous emails and other documents make Ganos's control over C3T and Pagasa crystal clear:

- C3T employees referred to Ganos as their "boss." PSR ¶¶ 82-84; Gov't Ex. 6, 7.

- Ganos received regular emails with C3T's bank account activity so that he could direct its financial activity. PSR ¶ 86; Gov't Ex. 8.

- Ganos approved C3T employees' bonuses. PSR ¶ 87; Gov't Ex. 11-12.

- Ganos reviewed C3T's fraudulent submissions to the VA. PSR ¶ 144-145; Gov't Ex. 25-26.

- Each year, Ganos commissioned CPA-reviewed financial statements that consolidated C3T with Sonag Company, Sonag Ready Mix, and Nuvo. PSR ¶ 104-113; Gov't Ex. 14.

- Ganos laundered millions of dollars of profits from C3T to other companies he controlled, including Trinity Marketing, Sonag I, LLC, and Sonag Company. PSR ¶¶ 124, 126, 127; *see* Gov't Ex. 13, 17, 18.

- Ganos directed that Pagasa receive (1) start-up funding from Nuvo and C3T; (2) bookkeeping, IT, and other staff support from Sonag and C3T employees; and (3) bonding backed by Ganos and his companies. PSR ¶¶ 97-103.

Ganos's denials amount to further obstruction and are inconsistent with acceptance of responsibility. Thus, the total offense level should be 43, for a Guidelines range of life, although the statutory maximum penalty is 20 years. PSR ¶ 215.

3

### B. The PSR's Loss Amount Is Correct, But the Court Should Depart Downward by 8 Levels

A 28-level increase is warranted under U.S.S.G. § 2B1.1(B)(1)(o) because the loss amount exceeded $250 million. Ganos's objection is contrary to the Seventh Circuit's decision in *United States v. Giovenco*, 773 F.3d 866 (7th Cir. 2014). *Giovenco* holds that U.S.S.G. § 2B1.1, Application Note 3(F)(v) applies to the calculation of the loss amount under the Sentencing Guidelines. *Id.* at 870-71. Under that Note, because this case involves "regulatory approval by a government agency" that was "obtained by fraud," the "'loss shall include the amount paid for the property, services, or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.'" *Id.* (quoting Appl. Note 3(F)(v)). Ganos disputes his role vis-à-vis C3T, but he does not dispute that the overall scheme caused payments of approximately $260,276,000. *See* PSR ¶ 165; *see* Gov't Ex. 3. Thus, the 28-level increase is correct.

That said, the 28-level increase results in a very high Guidelines range. The government respectfully requests that the Court modify the loss amount through a downward departure, just as the district court did, with the Court of Appeals' approval, in *Giovenco*. *See* 773 F.3d at 871; *see also United States v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) ("Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime."). Specifically, the district court in *Giovenco* imposed a loss amount that corresponded to amount of profits or gain that resulted from the scheme. *See* 773 F.3d at 871.

Here, the PSR indicates that the profits from Ganos's scheme are conservatively estimated to be between $10 million and $15 million. *See* PSR ¶¶ 121-122. Ganos's complaint that those profit estimates "do not reflect any personal benefit to Brian Ganos" misses the mark for two reasons. First, loss and gain under U.S.S.G. § 2B1.1 are to be measured as a result of the offense

4

as a whole, not with reference to any particular defendant. *See* App. note 3(A) (referencing "harm that resulted from the offense"); App. note 3(B) (referencing "gain that resulted from the offense"). Second, the PSR sets forth in detail that Ganos did, in fact, obtain the vast majority of the profits from the scheme. *See* PSR ¶ 129. Under this approach, there would be a 20-level increase for loss exceeding $9,500,000. *See* U.S.S.G. § 2B1.1(b)(1)(K). This would result in an 8-level downward departure.

Taken together with the downward departure, the offense level should be 35, and the criminal history category should be I, for a Guidelines range of 168 to 210 months.

## II. A Sentence of 78 Months Is Sufficient to Satisfy the § 3553(a) Factors

After determining the Guidelines range, the Court must consider the factors set forth in § 3553(a) to fashion a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a); *see Gall*, 552 U.S. at 49-50. Although the Court "'may not presume the Guidelines range is reasonable,'" the Guidelines range remains the "lodestone" of sentencing. *Peugh*, 133 S. Ct. at 2083–84 (quoting *Gall*, 552 U.S. at 50). "A district court contemplating a non-Guidelines sentence 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id.* (quoting *Gall*, 552 U.S. at 50). The government respectfully requests that the Court impose a sentence of 78 months.

### A. Nature & Circumstances of the Offense

Section 3553(a)(1) directs the Court to consider the "nature and circumstances of the offense." Several aspects of this offense warrant a lengthy period of incarceration.

1. <u>Length of Offense</u>. The duration of the offense is significant, reflecting not an isolated lapse in judgment but a pattern of unrelenting deception. The indictment alleges a scheme that spanned over twelve years, from 2004, when Ganos and co-conspirators obtained 8(a)

5

certification for Nuvo based on false representations, to August 2016, when the execution of search warrants finally disrupted Ganos's scheme.

2.  <u>Loss Amount</u>. The loss amount—whether viewed as gross proceeds of over $260 million or profits of over $10 million—underscores that the sheer scope of this fraud scheme is astounding. That loss amount reflects payments on no fewer than 245 separate set-aside contracts or disadvantaged business enterprise projects. *See* Gov't Ex. 3. To be sure, most of the gross proceeds paid for materials and labor that inured to the government's benefit. The government does not dispute that it generally received the contracted-for work. But profits exceeding $10 million principally benefitted Ganos personally, and allowed him to live an extravagant life that made a mockery of these government programs intended to assist disadvantaged individuals.

3.  <u>Impact on Victims</u>. Contrary to Ganos's suggestions, his fraud harmed multiple victims.

First, the government did not get the benefit of the bargain in the 245 contracts and DBE projects. The government sought to contract with companies that legitimately qualified for the set-aside programs. The government intended to help such companies become established and successful so that a multitude of companies with disadvantaged owners could successfully compete for government contracts. Because of Ganos, the government received none of those programmatic benefits.

Second, and relatedly, the small business programs—the 8(a) program, the DBE program, and the SDVOSB program—were harmed because Ganos's fraud undermines their credibility and effectiveness. As a result, public support for the programs may diminish, and the government is forced to spend more on policing compliance with the program.

Third, numerous companies that legitimately qualify under the set-aside programs were harmed by losing contracts to Ganos's companies. *See* PSR ¶¶ 130-137. This case does not just

6

involved abstract harm to government policy goals. Ganos's fraud harmed real people, such as C.G., K.W., and I.M.-O., whose companies lost work to Ganos. For example, I.M.-O. explains that losing a particular contract to Nuvo was "devastating" to his company, not only because he lost out on the work, but also because he was unable to bid on other projects while pursuing the one that Nuvo fraudulently obtained. *See* PSR ¶ 137.

Ganos has claimed that his fraud "saved the government money." But this is not true. Nuvo and C3T won many contracts as "sole source" awards, meaning that the government did not open the contract to other bidders. The government typically awarded sole-source set-aside contracts when there did not appear to be other contractors who qualified to bid for set-aside contracts. If the government had known that Nuvo or C3T also was not so qualified, the government likely would have not have resorted to sole-source contracting. Instead, the government would have opened the contracts to competitive bidding among all contractors—and thereby paid less for the work. Even as to the contracts for which Nuvo or C3T was the lowest bidder, it was only the lowest bidder compared to bona fide set-aside contractors. If the government had opened the bidding to all contractors, it likely would have attracted bids that were lower than Nuvo or C3T's. Thus, Ganos's scheme likely caused the government to pay *more* money than it would have paid to a non-set-aside contractor.

4. <u>Nature of the Deceit</u>. Although every wire fraud offense involves false representations, Ganos's lies were extraordinary for their variety and brazen nature. This offense did not involve just a single, one-off misrepresentation. Rather, Ganos was willing to say and do whatever was necessary to continue deceiving the small business programs and even criminal investigators. The PSR recounts Ganos's myriad actions to trick the government, including:

- When Milwaukee County questioned Nuvo's qualifications in 2006, Ganos drafted an indignant letter in Lopez's name that accused the County of making accusations that were a "slap in my face." PSR ¶ 139.

7

- When the Wisconsin DOT questioned Nuvo's qualifications in 2010, Ganos directed a comprehensive, false response that included the creation of a fake lease that was backdated to appear operative. PSR ¶ 141.

- Ganos directed that when SBA representatives would come for a site visit, an office for Lopez be set up, and Lopez would be coached on how to give false answers to the regulators. PSR ¶ 142.

- In 2011, the FBI and VA Office of Inspector General conducted a criminal investigation and interviewed Ganos and his co-conspirators. Each of them lied, denying that C3T had any affiliation with Nuvo or Sonag Company. PSR ¶ 148.

Ganos's conscience-shocking willingness to lie, forge documents, and rope others into his scheme allowed the scheme to continue to operate—and continue to personally enrich Ganos—for years.

In sum, the nature and circumstances of the offense are very serious and require a lengthy term of imprisonment.

### B. History & Characteristics of the Defendant

In fashioning a sentence, the Court also must assess Ganos's history and characteristics. 18 U.S.C. § 3553(a)(1). Ganos had substantial advantages in life that many other criminal defendants lack. He describes both his mother and stepfather as positive influences, with his stepfather being "tough but loving." PSR ¶¶ 187-188. Ganos completed high school at Brookfield Academy and enrolled in Marquette University before engaging in work. PSR ¶¶ 205-206. Ganos appears to have natural intelligence, a persuasive personality, and a capacity for business, having started Sonag Company, Sonag Ready Mix, and then the front-companies at issue in this scheme. *See* PSR ¶¶ 206-208.

Even with these advantages, however, Ganos chose to engage in this long-term fraud scheme. He was motivated principally by greed. Having benefitted from the set-aside programs legitimately, Ganos was unwilling to play by the rules. He instead persistently took advantage of the programs and amassed wealth for himself. Along the way, he corrupted numerous other

8

individuals, many of whom have pleaded guilty to felonies or otherwise had their lives turned upside down.

Ganos may contend that his age (59) is a mitigating factor. But the relevant policy statement provides that age may justify a reduced sentence only if age-related considerations are "present to an usual degree and distinguish the case from the typical cases covered by the Guidelines." U.S.S.G. §§ 5H1.1, 5H1.4. The policy statement provides the example of a defendant who is "elderly and infirm." U.S.S.G. § 5H1.1. Ganos is neither elderly nor infirm.

Nor should the Court reduce Ganos's sentence on grounds that he must care for his family. "[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure [from the Guidelines] may be warranted." U.S.S.G. § 5H1.6. That is because "[m]ost families suffer emotional and financial harm when a parent is imprisoned," and hence, the impact is not a mitigating circumstance. *United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010).

Similarly, the fact that Ganos has forfeited substantial assets to the government is not a mitigating factor. The forfeitures reflect simply Ganos being stripped of (what remains of) his ill-gotten gains. The Seventh Circuit has explained that forfeiture made pursuant to a plea agreement does not reflect "extraordinary acceptance of responsibility" meriting a downward departure. *United States v. Hendrickson*, 22 F.3d 170, 176 (7th Cir. 1994). Because U.S.S.G. § 5E1.4 states that "[f]orfeiture is to be imposed upon a convicted defendant as provided by statute," the Sentencing Commission expressly considered forfeiture to be a part of the criminal sentence "to be imposed in addition to, not in lieu of, incarceration." *Id.* In sum, Ganos's history and characteristics do not provide reasons to reduce the sentence.

### C. Purposes of Sentencing

The recommended sentence of 78 months would be sufficient, but not greater than necessary, to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Significant

incarceration is needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

A significant sentence is required especially to deter others from pursuing fraudulent schemes and abusing public programs. The potential for general deterrence is heightened here because Ganos and this scheme are well known among government contractors. This case is being covered not only in local news media but also in nationwide media sources that cover the construction industry.[2] Lengthy incarceration will send the proper message to contractors, whereas any sentence less than 78 months could send the troubling message that defrauding government set-aside programs is worth the risk. The Court should impose the requested 78-month sentence to send a message that set-aside contract fraud does not pay.

### D. Guidelines Range & the Need to Avoid Unwarranted Disparity

Section 3553(a)(6) requires the Court to consider the "need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." After *Booker*, the "federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines." *Peugh*, 133 S. Ct. at 2083–84. The government is recommending a sentence significantly below the Guidelines, given the unique economic realities of this fraud. But to vary any further below the Guidelines would create a real risk of unwarranted disparities with other defendants. That is true with regard to defendants sentenced around the country before other district courts who are all required to use the Guidelines

---

[2] *See, e.g.*, *3 more agree to plead guilty in $200M Wisconsin contractor fraud case*, ConstructionDive (Apr. 19, 2018), available at https://www.constructiondive.com/news/wisconsin-construction-company-charged-with-200m-minority-business-fraud/520766/; *US contractor prosecuted for $200 m "straw man" fraud*, Global Construction Review (Apr. 3, 2018), available at http://www.globalconstructionreview.com/news/us-contractor-prosecuted-200m-straw-man-fraud/.

as their starting point. That is also true with regard to defendants sentenced in this district, as the following table demonstrates:

**Selected Sentences in White Collar Cases in E.D. Wisconsin**

| Case No. | Defendant | Judge | Sentence | Appox. Loss |
|---|---|---|---|---|
| 07-CR-245 | Martin Valdez | Adelman | 72 months | $1,227,591 |
| 07-CR-113 | James Lytte | Stadtmueller | 84 months | $1,794,438 |
| 08-CR-208 | Dale Endries | Griesbach | 71 months | $2,610,443 |
| 08-CR-325 | M. Morris | Clevert | 97 months[3] | $20,000,000 |
| 07-CR-204 | Michael Lock | Stadtmueller | 160 months | $1,458,823 |
| 10-CR-006 | Sue Sachdeva | Adelman | 99 months[4] | $34,000,000 |
| 10-CR-176 | Mervyn Rutley | Adelman | 72 months | $205,247 |
| 13-CR-219 | Lisa Lewis | Griesbach | 180 months | $2,021,486 |
| 13-CR-135 | Mark Parks | Griesbach | 108 months | $1,500,000 |
| 14-CR-196 | D. Jones | Clevert | 70 months[7] | $705,000 |
| 14-CR-196 | C. Mitchell | Clevert | 72 months | $550,000 |
| 15-CR-214 | Gregory Kuczora | Griesbach | 70 months | $1,000,000 |
| 07-CR-057 | Thomas Balsiger | Clevert | 120 Months | $65,000,001 |
| 14-CR-196 | Ashley Dover | Clevert | 90 months | $1,700,000 |
| 15-CR-115 | Todd Dyer | Stadtmueller | 180 months | $1,802,482 |
| 16-CR-100 | Todd Dyer | Pepper | 110 months | $937,000 |
| 15-CR-214 | Gregory Kuczora | Griesbach | 70 months | $1,200,000 |
| 17-CR-078 | Amalia Gamboa | Pepper | 60 months | $3,500,000 |
| 17-CR-160 | Ron Van den Heuvel | Griesbach | 90 months | $9,428,618 |
| 18-CR-116 | James Nickels | Griesbach | 84 months | $3,193,616 |
| 18-CR-144 | Albert Golant | Pepper | 126 months | >$9,500,000 |

In short, a sentence lower than 78 months in this case would create unfair disparities with comparable defendants.

## CONCLUSION

The United States respectfully requests that the Court impose a sentence of 78 months; a period of supervised release; a fine of $5,000; a special assessment of $200; and include in its announcement of sentence and written judgment all the forfeiture provisions set forth in the Court's August 5, 2019 Preliminary Order of Forfeiture (R. 200).

---

[3] Defendant was 71 years old and in poor health at the time of sentencing.
[4] This sentence was reduced for substantial assistance to the government in other cases.

11

Dated at Milwaukee, Wisconsin, this 9th day of December, 2019.

    Respectfully submitted,

    /s/ Matthew D. Krueger
    MATTHEW D. KRUEGER
    United States Attorney
    SCOTT J. CAMPBELL
    ADAM H. PTASHKIN
    Assistant United States Attorneys
    Office of the United States Attorney
    Eastern District of Wisconsin
    517 E. Wisconsin Ave., Suite 530
    Milwaukee, Wisconsin 53202
    Tel: (414) 297-1700